**In re B–K OF KANSAS, INC., Burger King Franchise Corporation, Debtor.**

**Bankruptcy No. 85–20110–7C.**

United States Bankruptcy Court,
D. Kansas.

Jan. 29, 1988.

Dan E. Turner, Topeka, Kan., Mark Klein, Kansas City, Mo., for debtor.

Scott Alan Orth, of Hall, O'Brien & Robinson, P.A., Miami, Fla., J.B. King, Topeka, Kan., for Burger King Corp.

James S. Willard, Topeka, Kan., for Highland Park Bank & Trust.

Michael H. Berman, Prairie Village, Kan., Trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter came for hearing on November 9, 1987, on the motion of Burger King Corporation for determination of the status and the amount of its administrative claim during the chapter 7. Burger King Corporation appeared by and through counsel, Scott Alan Orth and J.B. King. The trustee, Michael H. Berman, objected to the motion and appeared in person and as attorney for the trustee. Highland Park Bank & Trust, the major secured creditor, also objected and appeared by and through counsel, James S. Willard.

## FINDINGS OF FACT

Based upon the testimony at the hearing, the pleadings, and the file, this Court finds as follows:

1. On January 30, 1985, B–K of Kansas, Inc. filed for relief under chapter 11 of Title 11, United States Code. B–K of Kansas, Inc. operated two "Burger King" restaurants in Topeka, Kansas. For simplicity sake, the Court will refer to the two stores as the "Downtown" store and the "White Lakes" store.

2. On April 29, 1987, this Court converted the case from chapter 11 to chapter 7. On May 1, 1987, Michael H. Berman accepted his appointment as chapter 7 trustee of B–K of Kansas, Inc.

3. After the conversion, the trustee continued to operate the restaurants as "Burger Kings." The restaurants used Burger King Corporation's trade and service marks, including: "Burger King"; "Home of the Whopper"; "Whopper"; as well as the Burger King system.

4. On August 31, 1987, this Court ordered that the Burger King signs be taken down and that the estate refrain from displaying certain other Burger King indicia. However, the Court allowed the estate the use of the old menu boards, uniforms, and remaining inventory.

5. The gross sales of the two restaurants for the period from April 29, 1987 through August 31, 1987, are as follows: $266,395.49 at the Downtown store; and $365,879.00 at the White Lakes store.

6. During the period from April 29, 1987 to August 31, 1987, the trustee used Distron as its supplier of the two restaurants of its meat products, frozen foods, sandwich ingredients, condiments, shorten-

ing, paper products, produce, salad bar items, dairy products, breakfast items, and operating supplies. Distron is a wholly owned subsidiary of Burger King Corporation.

7. Distron required that the trustee pay for each shipment by a cashier's check. The estate paid Distron in full for all shipments.

8. During the period from April 29, 1987 through August 31, 1987, Burger King Corporation conducted a national advertising campaign for two new products, "Burger Bundles" and "Bagel Sandwiches." Burger King Corporation, through Distron, refused to sell "Burger Bundles" and "Bagel Sandwiches" to the two restaurants.

9. During the period from April 29, 1987 through August 31, 1987, the trustee did not locally advertise these two restaurants as Burger King restaurants.

10. On September 14, 1987, Burger King Corporation filed its motion for determination of status and amount of administrative claim during the chapter 7. Burger King Corporation requested an administrative expense allowance for the use of the trade and service marks from April 29, 1987 through August 31, 1987. Burger King Corporation argues that proper method for determining the amount of the claim is by using the terminated franchise agreement between B–K of Kansas, Inc. and Burger King Corporation. Under the terminated franchise agreement, B–K of Kansas, Inc. agreed to pay 4% of gross sales from both stores for advertising, 2.9% of gross sales at the White Lakes store for royalties; and 3.5% of gross sales at the Downtown store for royalties. Applying the above percentages to the gross sales figures of $365,879.00 at White Lakes and $266,395.49 at Downtown, Burger King requests a total of $45,225.28 as an administrative expense.

## CONCLUSIONS OF LAW

Section 503(b)(1)(A) governs the allowance of administrative expense status for the actual, necessary costs and expenses of preserving the estate and, in part, states:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

■ Certainly Burger King Corporation's claim rises to an administrative expense claim *status*. The trustee successfully operated the restaurants using Burger King Corporation's trade and service marks. The two restaurants brought in gross sales of over $630,000.00 over a four month period. No one can seriously question that the use of the famous Burger King name had a lot to do with the sales. The use of Burger King Corporation's trade and service marks by the chapter 7 trustee was "an actual, necessary cost and expense of preserving the estate."

However, problems arise in trying to determine the *amount* of the administrative expense claim. How should the Court measure the reasonable value of the estate's use of Burger King Corporation's trade and service marks during the period from April 29, 1987 through August 31, 1987?

■ Burger King Corporation asserts that the reasonable value for the estate's use of the trade and service marks is the contracted for amount. B–K of Kansas, Inc. previously agreed to pay 4% of gross sales at both stores as an advertising contribution; 2.9% of gross sales at the White Lakes store for royalties; and 3.5% of gross sales at the Downtown store for royalties. Applying the above percentages to the gross sales figures of $365,879.00 at White Lakes and of $266,395.49 at Downtown, Burger King requests a grand total of $45,225.28 as an administrative expense.

The Court finds that it is not bound by the franchise agreement percentages. Burger King Corporation is aware that the contract has terminated, as that has been Burger King Corporation's own position since day one of this bankruptcy. Burger King Corporation cannot change horses in

midstream and start arguing that the contract now controls this situation. Accordingly, this Court is free to reduce the percentages to a more "reasonable" amount in this case.

The Court further finds that Burger King Corporation's proposed percentages are excessive and will have to be substantially reduced for several reasons. First, the estate did not advertise locally. Second, Burger King Corporation's national advertising did not particularly aid these two stores. During the period from April 29, 1987 through August 31, 1987, Burger King Corporation conducted a national advertising campaign for two new products, "Burger Bundles" and "Bagel Sandwiches;" and Burger King Corporation refused to sell these products to the Downtown store and the White Lakes store. Furthermore, Burger King Corporation did not offer its normal services to the two stores. For instance, the estate did not get to use new products such as above and the estate always had to pay for its goods by cashier's check upon delivery—certainly a burdensome process that other franchises did not have to endure.

After reviewing all the testimony at the November 9, 1987 hearing, and considering the above factors, this Court finds that more reasonable percentages in this case are 1% of gross sales of both stores for an advertising contribution, and 1% of gross sales of both stores for royalties. Based upon my calculations, this comes to a total administrative expense of $12,645.49.

This Court notes that Highland Park Bank & Trust argues that the Court should deny the administrative expense request on the basis that it holds a super priority position over Burger King Corporation's claim on all the cash generated by the stores. Nevertheless, this Court finds that the Bank's argument is premature and must be taken up on its own motion. However, in order to protect the Bank, this Court will allow Burger King Corporation's claim, but defer distribution until further order. (Most likely distribution will have to be pro rata with other administrative expense claims.)

IT IS THEREFORE, BY THE COURT, ORDERED That Burger King Corporation's claim for administrative expense be and the same hereby is allowed in the amount of $12,645.49.

IT IS FURTHER, BY THE COURT, ORDERED That distribution of such claim be deferred until further order of this Court.