66 F.3d 1091
 27 Bankr.Ct.Dec. 1185, Bankr. L. Rep. P 76,648,
95 Cal. Daily Op. Serv. 7694,
95 Daily Journal D.A.R. 13,159
 In re DAK INDUSTRIES, INCORPORATED, Debtor.
MICROSOFT CORPORATION, Appellant,
v.
DAK INDUSTRIES, INCORPORATED; Official Committee of
Unsecured Creditors; The Tokai Bank, Limited, Appellees.
 No. 94-55029.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 2, 1995.
Decided Oct. 2, 1995.
 
 Michael S. Kogan, Arter & Hadden, Los Angeles, CA, for appellant.
 Joseph A. Eisenberg, Timothy T. Read, and Werner Disse, Levene & Eisenberg, Los Angeles, CA, for appellee DAK Industries, Incorporated.
 Steven N. Bloom and Gary Owen Caris, Frandzel & Share, Los Angeles, CA, for appellee The Tokai Bank, Ltd. and Los Angeles Agency.
 Thomson Young and Harry D. Hochman, Pachulski, Stang, Ziehl & Young, Los Angeles, CA, for Official Creditors Committee.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, BRUNETTI, and T.G. NELSON, Circuit Judges.
 BRUNETTI, Circuit Judge:
 
 
 1
 Microsoft Corporation appeals from an order of the district court affirming the bankruptcy court's denial of its administrative expense claim filed pursuant to 11 U.S.C. Sec. 503. We have jurisdiction under 28 U.S.C. Sec. 158(d), and we affirm.
 
 FACTS AND PROCEEDINGS BELOW
 
 2
 In April 1991, Microsoft, a distributor of computer software, and DAK Industries, Inc., a distributor of computer hardware, entered into a "License Agreement" granting DAK certain nonexclusive, worldwide "license rights" to Microsoft's Word for Windows software (Word). The agreement gave DAK the right to adapt Word to enable it to run on computer systems sold by DAK, to copy Word, and to distribute and license Word to consumers during a specified term. DAK also received the right to accept updates and new versions of Word, as well as the right to distribute copyrighted documentation that explained how to use Word. As a practical matter, the agreement provided that Microsoft would furnish DAK with a master disk containing Word, and that DAK would copy the program and load it onto computer hardware units, which it then sold to end consumers.
 
 
 3
 The agreement provided that DAK would pay a "royalty rate" of $55 per copy of Word that it distributed. Upon signing the agreement, DAK became obligated to pay Microsoft a "minimum commitment" of $2,750,000 in five installments, regardless of how many copies of Word it sold. The payment schedule was:
 
 
 4
 1) Signing of agreement: $250,000
2) First payment date: $406,250
3) 3 months after first payment date: $697,917
4) 6 months after first payment date: $697,917
5) 9 months after first payment date: $697,917
 
 
 5
 The first payment date depended upon when DAK first sold a copy of Word to a consumer. The term of the agreement expired one year after the first payment date.
 
 
 6
 DAK's $2,750,000 minimum commitment paid Microsoft royalties at the $55 per unit price for the distribution of 50,000 copies of Word. DAK could sell any and all of those copies to consumers at any time during the term. The agreement provided that if DAK sold more copies than those paid for by the minimum commitment, DAK would pay Microsoft $55 for each additional copy sold. However, if DAK sold fewer copies than those paid for by the minimum commitment, Microsoft would not refund any of the commitment. Microsoft did not perfect a security interest in any of DAK's property, which might have protected it against DAK's failure to pay the entire minimum commitment in the event of bankruptcy.
 
 
 7
 Sometime between July and December of 1991, the parties amended the agreement by reducing the royalty rate to $45. As a result of the amendment, the minimum commitment paid royalties for the sale of more than 50,000 copies of Word.
 
 
 8
 The first payment date was December 30, 1991. In accordance with the payment schedule, DAK paid the first three installments, totaling $1,354,167. On June 11, 1992, DAK filed a petition for bankruptcy. The debtor has not paid the final two installments, totaling $1,395,833.
 
 
 9
 On December 1, 1992, Microsoft moved in the bankruptcy court for an order compelling the debtor to assume or reject the executory contract with Microsoft. On January 12, 1993, Microsoft filed a motion for the payment of an administrative expense, claiming it should be compensated for the debtor's post-bankruptcy petition "use" of the license agreement, because the debtor continued to distribute Word.
 
 
 10
 On February 3, 1993, the bankruptcy court denied Microsoft's administrative expense claim. The court concluded that the payment structure of the agreement was more analogous to payments on a sale of goods than to royalty payments for the continuing use of an intellectual property. As such, the debt was a prepetition unsecured claim, not a postpetition administrative expense claim. The court also concluded that the agreement was an executory contract, and that the debtor had until May 4, 1993, to assume or reject the agreement.
 
 
 11
 In April 1993, Microsoft moved for reconsideration of the denial of its administrative expense claim. The bankruptcy court denied that motion on June 16, 1993.
 
 
 12
 The debtor rejected the agreement on May 4, 1993. The parties agree that DAK had sold approximately 13,244 copies of Word prior to filing for bankruptcy on June 11, 1992. They also agree that the debtor sold approximately another 7,600 copies between June 11, 1992, and January 21, 1993, a date one week before the bankruptcy court hearing on Microsoft's administrative expense claim. The record does not reflect how many copies of Word the debtor sold between January 21, 1993, and May 4, 1993, the date when it formally rejected the agreement and stopped selling Word.[1]
 
 
 13
 Microsoft appealed the bankruptcy court's denial of its administrative expense claim to the district court. The district court concluded that the debtor had received benefits from its postpetition distribution of Word. However, the court concluded that the payment schedule resembled installment payments for the sale of goods, not periodic royalties for the use of intellectual property. Therefore, the obligations for the amounts due under the agreement were incurred prepetition. The court also concluded that Microsoft was neither induced to nor continued to provide software units at its expense after the filing of the petition. Accordingly, Microsoft had provided no postpetition consideration to debtor. The court rejected Microsoft's administrative expense claim, thereby leaving the remaining amount due under the agreement as a prepetition, unsecured claim.
 
 STANDARD OF REVIEW
 
 14
 The role of the district court and this court are basically the same in the bankruptcy appellate process. In re Christian Life Center, 821 F.2d 1370, 1373 (9th Cir.1987). Therefore, we review the bankruptcy court decision directly. Id. We review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo. In re Comer, 723 F.2d 737, 739 (9th Cir.1984).
 
 ANALYSIS
 
 15
 Under the bankruptcy code, an administrative expense claim has priority over other unsecured claims. 11 U.S.C. Sec. 503 provides in pertinent part:
 
 
 16
 (a) An entity may file a request for payment of an administrative expense.
 
 
 17
 (b) After notice and a hearing, there shall be allowed administrative expenses ... including--
 
 
 18
 (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....
 
 
 19
 The burden of proving an administrative expense claim is on the claimant. In re Sinclair, 92 B.R. 787, 788 (Bank.S.D.Ill.1988). The claimant must show that the debt asserted to be an administrative expense
 
 
 20
 (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefitted the estate.
 
 
 21
 In re White Motor Corp., 831 F.2d 106, 110 (6th Cir.1987). The bankruptcy court has broad discretion to determine whether to grant such a claim. In re Dant & Russell, Inc., 853 F.2d 700, 706 (9th Cir.1988). In order to keep administrative costs to the estate at a minimum, "the actual, necessary costs and expenses of preserving the estate," Sec. 503(1)(A), are construed narrowly. In re Palau, 139 B.R. 942, 944 (9th Cir. BAP 1992), aff'd, 18 F.3d 746 (9th Cir.1994).
 
 
 22
 In this case, the debtor rejected an executory contract without ever assuming it. Under 11 U.S.C. Sec. 365(g)(1), for purposes of bankruptcy proceedings, that rejection constitutes breach of the contract immediately prior to the date on which the bankruptcy petition was filed. Nonetheless, after the petition, the debtor continued to distribute copies of the software provided under that contract. The estate directly and substantially benefited from these postpetition sales of Word. Therefore, Microsoft is entitled to an administrative expense claim if the debt outstanding on the contract arose after the petition or if Microsoft provided consideration to the debtor after the petition. See White Motor Corp., 831 F.2d at 110. Otherwise, Microsoft is entitled only to a prepetition, unsecured claim.
 
 
 23
 Microsoft argues that this transaction should be viewed as an agreement granting DAK the use of intellectual property. Accordingly, Microsoft claims that the debt arose after the petition as periodic payments for use of the property became due. Microsoft also argues that even though the transaction was initiated prior to the petition, Microsoft provided consideration after the petition by continuing to make the intellectual property available for the debtor's use. Characterized this way, the transaction is analogous to a debtor's postpetition use of leased property under an agreement signed prepetition. Such use gives rise to an administrative expense claim for the payment of rent. Philadelphia Co. v. Dipple, 312 U.S. 168, 174, 61 S.Ct. 538, 540, 85 L.Ed. 651 (1941).
 
 
 24
 DAK, the Tokai Bank, (DAK's largest creditor), and the committee of unsecured creditors all respond that this transaction should be viewed as a prepetition sale by Microsoft of software units to DAK. Accordingly, DAK claims that the entire debt arose prior to the petition, when the sale took place. DAK also argues that Microsoft did not provide consideration to DAK after the petition; rather, DAK only sold software units which it had already purchased from Microsoft prepetition. Characterized this way, the transaction is analogous to a debtor selling goods out of its inventory postpetition that it bought prepetition on unsecured credit. While the estate benefits, the creditor is not entitled to an administrative expense claim. Rather, it simply has an unsecured claim.
 
 
 25
 When applying the bankruptcy code to this transaction, we must look through its form to the "economic realities of th[e] particular arrangement." In re Moreggia & Sons, Inc., 852 F.2d 1179, 1182 (9th Cir.1988).[2] We conclude that this agreement is best characterized as a lump sum sale of software units to DAK, rather than a grant of permission to use an intellectual property. Accordingly, debt arose prepetition and Microsoft gave no consideration postpetition. We reach this conclusion for several reasons.
 
 
 26
 First, DAK's entire debt to Microsoft arose prepetition. The bankruptcy code defines "debt" as liability on a "claim." 11 U.S.C. Sec. 101(11). It defines a "claim" in part as the "right to payment, whether or not such right is ... contingent, matured, [or] unmatured...." 11 U.S.C. Sec. 101(4). The agreement here provided that upon signing, DAK was absolutely obligated to pay $2,750,000, even if it sold only one copy of Word. The fact that some of the payments became due postpetition does not alter the fact that the entire debt was absolutely owed prepetition, and was therefore prepetition debt. See In re A & B Homes, Ltd., 98 B.R. 243, 249 (Bankr.E.D.Va.1989).
 
 
 27
 Second, the pricing structure of the agreement indicates that it was more akin to a sale of an intellectual property than to a lease for use of that property. The amount of the minimum commitment, as well as any additional payments, was calculated based upon quantity of units DAK obtained, as in most sales arrangements, not upon the duration of the "use" of the property, as in most rental arrangements.
 
 
 28
 Third, as in a sale, DAK received all of its rights under the agreement when the term of the agreement commenced. Initially, DAK made a down payment on its $2,750,000 minimum commitment. At that point, the agreement permitted DAK to distribute immediately the full quantity of units covered by its $2,750,000 commitment. The remaining amount due on that commitment was to be paid in future installments. This arrangement is similar to a purchase of goods on unsecured credit: The purchaser makes a down payment, obtains and can dispose of the goods immediately, and then pays the remainder of the purchase price in subsequent installments. The timing of DAK's installment payments confirms this analysis. The installment dates did not correlate with when DAK could sell the 50,000 programs in the way that rent payment dates generally correlate with time during which rental property is used. Instead, DAK could sell all of the programs at the outset of the term, even though the installments were due three, six and nine months into the term.
 
 
 29
 Fourth, it is more accurate to describe this agreement as granting DAK a "right to sell" than "permission to use" an intellectual property. Microsoft relies upon various cases in which the claimant granted debtor temporary permission to employ the claimant's property to run its operation. In In re B-K of Kansas, Inc., 82 B.R. 135 (Bankr.D.Kan.1988), aff'd, 99 B.R. 446 (D.Kan.1989), the court allowed an administrative expense claim for the debtor's postpetition display of the Burger King trademark in order to attract customers. 82 B.R. at 137; 99 B.R. at 448. In In re Neville Island Glass Co., Inc., 78 F.Supp. 508 (W.D.Penn.1948), the court allowed an administrative expense claim for the debtor's use in its glass manufacturing process of the claimant's patented equipment, which was installed in the debtor's plant pursuant to a lease-license agreement. Id. at 508-09. Unlike those cases, DAK did not employ Word over a period of time in order to run its operation. Rather, it sold the program to consumers. Accordingly, DAK's postpetition distribution of Word is more like the sale of inventory than the utilization of the claimant's trademark or device described in B-K of Kansas and Neville Island.
 
 
 30
 Finally, Microsoft did not provide anything at its expense to the debtor after the petition. As discussed above, at the time of the petition, Microsoft had already granted DAK the right to sell at least 50,000 copies of Word. Microsoft does not contend that DAK sold more than this amount. Furthermore, the district court found that the debtor did not accept any Word updates offered by Microsoft after the petition. The district court also found that Microsoft did not incur any additional expense postpetition by making its generally available software hotline service also available to DAK's customers. Microsoft challenges neither of these factual findings on appeal. For these reasons, this case is distinguishable from Broadcast Corp. of Georgia v. Broadfoot, 54 B.R. 606 (N.D.Ga.1985), aff'd sub nom. In re Subscription Television of Greater Atlanta, 789 F.2d 1530 (11th Cir.1986), upon which Microsoft relies. In that case, the court allowed an administrative expense claim because the claimant had continued to provide video scrambling services to the debtor, a subscription television station, after it had filed for bankruptcy. 54 B.R. at 612. In this case, Microsoft provided no services to the debtor postpetition.
 
 
 31
 For these reasons, the economic realities of this agreement indicate that it was basically a sale, not a license to use. The debt arose prepetition, and Microsoft did not provide the debtor any consideration postpetition. Microsoft was not entitled to an administrative expense claim.[3] See White Motor, 831 F.2d at 110.
 
 
 32
 Several policy considerations also counsel against granting Microsoft an administrative expense claim, which has priority over other unsecured claims. First, denying Microsoft's claim will not unjustly enrich the estate for the benefit of all other creditors. DAK paid Microsoft $1,354,167 prior to filing for bankruptcy. At the $45 per copy royalty rate provided by the amended agreement, DAK paid for up to 30,092 copies of Word. While the record is not clear as to the total number of copies sold, Microsoft does not contend that DAK sold more than 30,092. Therefore, DAK has not sold any copies for which it did not pay Microsoft at least the $45 royalty rate. Under these circumstances, granting Microsoft a priority over other unsecured creditors would be unjust. In addition, Microsoft might still recover some of the outstanding amount due under the agreement. That amount remains an unsecured claim. If any proceeds from the bankruptcy are distributed to unsecured creditors, Microsoft will receive a share.
 
 
 33
 Secondly, granting Microsoft priority over other unsecured creditors would not serve the purpose of Sec. 503. Sec. 503's principal purpose is to induce entities to do business with a debtor after bankruptcy by insuring that those entities receive payment for services rendered. See Christian Life Center, 821 F.2d at 1373. Payment of administrative expenses allows the debtor to secure goods and services necessary to administer the estate, which ultimately accrues to the benefit of all creditors. Id. In this case, Microsoft was not induced to and did not do business with the debtor postpetition. As we have described above, the transaction in this case took place before bankruptcy.
 
 CONCLUSION
 
 34
 The bankruptcy court and the district court properly denied Microsoft's administrative expense claim.
 
 
 35
 AFFIRMED.
 
 
 
 [1]
 In its brief to this court, DAK calculates that at the amended royalty rate of $45 per copy, it could have sold a total of 30,092 copies before exceeding the number for which it had paid prior to bankruptcy. According to this calculation, DAK could have sold 9248 additional copies between January 21, 1993, and May 4, 1993. (9248 + 7600 + 13,244 = 30,092)
 In its reply brief, Microsoft states that DAK's brief admits that DAK sold 9248 copies during that time. This mischaracterizes the statement in DAK's brief. DAK did not state how many units it actually sold during that time, but only that it never exceeded the amount for which it had paid.
 The record before this court does not establish how many copies of Word DAK sold between January 21, 1993, and May 4, 1993, when it stopped selling Word.
 
 
 [2]
 Because we look to the economic realities of the agreement, the fact that the agreement labels itself a "license" and calls the payments "royalties," both terms that arguably imply periodic payment for the use rather than sale of technology, does not control our analysis
 
 
 [3]
 We also note that Microsoft's reliance upon In re Prize Frize, 150 B.R. 456 (9th Cir. BAP 1993), aff'd, 32 F.3d 426 (9th Cir.1994), is misplaced. In that case, Prize Frize had granted a licensee an exclusive license to manufacture, use and sell its patented french fry vending machine. 32 F.3d at 427. In exchange, the licensee agreed to pay certain license fees to Prize Frize. Id. After Prize Frize filed for bankruptcy, it rejected the agreement. The court held that the license fees still owed by the licensee were "royalty payments" within the meaning of Sec. 365(n), and that therefore Sec. 365(n) required the licensee to pay those fees to the debtor in order to retain its rights under the agreement. Prize Frize, 32 F.3d at 428
 Microsoft claims that Prize Frize supports its argument that the "royalty payments" owed by DAK in this case were payments for continuous "use" of Word. However, the question in this case is not whether the payments owed are "royalty payments" under Sec. 365(n), but rather whether either the debt arose postpetition or Microsoft provided postpetition consideration to the debtor, such that Microsoft is entitled to a Sec. 503 administrative expense claim.
 Furthermore, the balance struck by Sec. 365(n) and the policies underlying that section are entirely different from those underlying Sec. 503. "Royalty payments" owed to the debtor under Sec. 365(n) are interpreted broadly in order to insure that the estate receives full payment when a licensee takes advantage of the debtor's intellectual property. See Prize Frize, 32 F.3d at 428. On the other hand, administrative expenses under Sec. 503 are construed narrowly because they give one unsecured creditor absolute priority in payment over other unsecured creditors and over the estate. The narrow construction of administrative expenses insures that payments out of the estate are kept to a minimum. In re Palau, 139 B.R. at 944.