**In re CARCO ELECTRONICS, a California corporation, Debtor.**

**Ideal Aerosmith, Inc., Movant,**

**v.**

**Carco Electronics, Respondent.**

**No. 03–33809 BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 25, 2006.

---

George T. Snyder, Esq. and Roy E. Leonard, Esq., for Ideal Aerosmith.

Peter D. Kerth, Esq., for Carco Finance, Inc.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Ideal Aerosmith, Inc. has brought a motion pursuant to § 503(b)(1)(A) of the Bankruptcy Code seeking an allowed administrative expense in the amount of $455,708.05.

Carco Finance, which holds an allowed pre-petition security interest in the assets of debtor Carco Electronics, Inc. as well as an allowed post-petition super-priority administrative expense claim, concedes that Ideal is entitled to an administrative expense claim in the amount of $67,350.92. It denies, however, that the remaining $355,357.19 of Ideal's claim is entitled to such treatment.

Ideal's motion will be granted in part and denied in part. It will be granted an administrative expense in the amount of $67,350.92. The remaining $355,357.19 in costs Ideal incurred while operating debtor's business, however, will not be accorded such treatment.

— FACTS —

Debtor designed and manufactured devices used in aircraft motion control systems. It had facilities in California and Pennsylvania.

Debtor filed a voluntary chapter 11 petition on October 31, 2003, and continued to operate its business pursuant to § 1107 of the Bankruptcy Code. Its schedules listed assets with a declared value of $2,627,752.81 and liabilities totaling $6,024,235.78.

Debtor was authorized on November 6, 2003, to borrow up to $500,000 from Carco Finance, a related entity, so that it could continue operating. As consideration for the loan, Carco Finance was granted a super-priority administrative expense claim. Subsequent orders authorized

debtor to borrow up to $1,500,000 from Carco Finance under the same terms.

Debtor's Second Amended Plan was confirmed on August 26, 2004. The plan was to be funded by the future sale to a third party of debtor's assets and from anticipated recoveries in certain avoidance actions.

The confirmed plan further provided that all allowed administrative expense claims would be paid in full. All other allowed claims would be paid on a *pro rata* basis after administrative claims were paid. Carco Finance would not receive any distribution in connection with its super-priority administrative claim until all other allowed administrative expense claims were paid in full.

This Court retained jurisdiction to, among other things, hear and decide the sale of debtor's assets as well as any objections to administrative expense claims.

Debtor ceased business operations at its facilities and terminated its employees on December 17, 2004, because of cash flow problems.

Approximately two weeks later, on December 30, 2004, debtor entered into an asset purchase agreement with Ideal Aerosmith, Inc. ("Ideal"), one of debtor's competitors. Among other things, the agreement provided that Ideal would purchase all of debtor's assets except for cash on hand and certain specified accounts receivable and would assume the leases for debtor's production facilities. Ideal in turn agreed to assume up to $700,000 of debtor's post-petition obligations.

The asset purchase agreement provided that Ideal could take possession and control of debtor's assets on January 2, 2005. Without first obtaining court approval to do so, Ideal moved in and took control of debtor's assets on that date. With the exception of debtor's president and one or two other individuals, Ideal hired all of debtor's former employees and began processing orders debtor had not completed before it shut down.

Several of the provisions of the asset purchase agreement are material and relevant to this proceeding.

Section 9.2 of the asset purchase agreement provided as follows:

... Buyer shall indemnify Seller and hold Seller harmless from any expenses arising or incurred in connection with the operation of the Seller's Business on or after ... [January 2, 2005] until the Closing or termination of this Agreement. This indemnification shall survive the Closing or termination of this Agreement.

Section 10.6 provided in part as follows:

... Buyer is not required to continue operations at any of Seller's former facilities; and Buyer, in its sole discretion, shall determine the extent, method and manner of how any of Seller's former facilities purchased or assigned to Buyer, if any, will be operated. If in its sole discretion Buyer hires former employees, managers or supervisors of Seller, these individuals shall be employed as new employees of Buyer....

Section 12.3 provided in part as follows:

Except as otherwise requested by Buyer, Seller shall use its best efforts to preserve its Business as a going concern and to preserve existing relationships with suppliers, customers and others having business dealings with Seller.... Nothing in Section 12.3 ... shall require Seller to actively operate the business or recall any of its employees pending the Closing....

Finally, section 13.2 of the agreement provided in part as follows:

.... In the event that Buyer elects to utilize the Assets to conduct its business

on or after ... [January 2, 2005], it shall do so with its own employees and for its own account, subject to the indemnification of Seller set forth in Section 9.2.

Debtor also filed a motion on December 30, 2004, requesting an order: (1) confirming that the marketing and sale of substantially all of its assets was conducted in accordance with its confirmed second plan; and (2) confirming the sale of its assets to Ideal. Concluding that the motion was not an "emergency", we issued an order scheduling the motion for hearing on February 1, 2005.

On January 2, 2005, and without prior authorization from this Court, Ideal began to operate the facilities debtor had shut down. It hired all but a handful of debtor's former employees and began processing orders debtor had not completed by December 17, 2004.

Acutronic USA, another of debtor's competitors, responded to debtor's "emergency" motion on January 10, 2005. Among other things, Acutronic asserted that it had tendered an offer to debtor's counsel to purchase debtor's assets for $1,100,000. It requested that debtor's "emergency" motion be denied and that the sale of debtor's assets be subject to higher and better offers.

Shortly thereafter, Acutronic brought a motion to prohibit Ideal from appropriating debtor's assets. Acutronic requested, among other things, an order directing Ideal to vacate debtor's facilities and to return any of debtor's assets Ideal had removed. It also asked that Ideal be prohibited from entering the facilities until a sale of debtor's assets had taken place.

Prior to January 14, 2005, this court was not aware that Ideal had taken control of debtor's business and was processing orders debtor had not finished before it shut down.

On January 21, 2005, we issued an order prohibiting Ideal from appropriating debtor's assets and to return any assets it had removed from the facilities.

A sale of debtor's assets was conducted on February 1, 2005. The initial bid at the sale was by Ideal, which had offered in the asset purchase agreement to assume up to $700,000 of debtor's post-petition obligations. Ideal made no further bids. Acutronic and Carco Finance then exchanged competing bids until Acutronic bid $1,800,000, at which point Carco Finance dropped out of the bidding. An order confirming the sale of debtor's assets to Acutronic in accordance with the terms and provisions of the asset purchase agreement of December 30, 2004, issued at the close of the hearing. No appeal was taken of the order confirming the sale to Acutronic.

On February 2, 2005, Ideal vacated debtor's facilities and turned control of debtor's assets over to Acutronic.

A few months later, on April 12, 2005, Ideal brought a motion pursuant to § 503(b)(1)(A) of the Bankruptcy Code requesting allowance of an administrative expense claim in the amount of $455,708.05. Ideal seeks to recoup the costs it incurred while operating debtor's business starting on January 2, 2005, and ending on February 2, 2005.

Ideal asserts that the costs it incurred were necessary to preserve the bankruptcy estate and conferred a benefit upon creditors, in particular Carco Finance. Without these expenditures, Ideal maintains, debtor's assets would not have had value as a going concern at the time of the sale. Ideal also contends that it would be inequitable to permit Carco Finance, the holder of a super-priority administrative claim, to reap the benefit Ideal conferred on the bankruptcy estate without also al-

lowing Ideal to have an administrative expense claim.

In its response to Ideal's motion, Carco Finance agreed that Ideal is entitled to an allowed administrative expense in the amount of $67,350.92 but objected to the remaining $355,357.19 of Ideal's request. Nothing in the asset purchase agreement, Carco Finance continues, obligated Ideal to operate debtor's business pending the anticipated sale to Ideal. Moreover, Ideal operated the business not to confer a benefit on the bankruptcy estate, but for its own benefit.

Debtor has joined in the objection of Carco Finance to Ideal's motion for allowance of an administrative expense in the amount of $455,708.05.

The matter has been tried and is ready for decision.

## — DISCUSSION —

*(I.) § 503(b)(1)(A).*

Ideal incurred the following costs and expenses while operating debtor's business in January of 2005:

(1) $67,350.92 to pay certain post-petition obligations owed by debtor such as rent, utilities and the like which were past-due when Ideal took over on January 2, 2005;

(2) $267,527.17 in employee wages and benefits;

(3) $86,667.96 for materials and services required to complete orders debtor had not completed before shutting down;

(4) $30,162.00 for rent due in January of 2005 for debtor's facilities; and

(5) $4,000.00 in unspecified "general and administrative expenses".

These expenses total $455,708.05.

Ideal's motion is based on § 503(b)(1)(A) of the Bankruptcy Code, which provides in part as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate. . . .

11 U.S.C. § 503(b)(1)(A).

Ideal maintains that by operating the business in January of 2005, it preserved the value of the business *as a going concern* and thereby conferred a benefit on the bankruptcy estate. Had it not maintained it as a going concern, Ideal continues, the business would have been worth less when it was sold on February 1, 2005.

■■■ For an expense to qualify as an administrative expense under § 503(b)(1)(A), it must be: (1) a "expense" (2) that is "actual" and "necessary" (3) to "preserving the estate". *Pennsylvania Department of Environmental Resources v. Tri–State Clinical Laboratories, Inc.,* 178 F.3d 685, 689 (3d Cir.1999), *cert. denied,* 528 U.S. 1075, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000). The cost or expense must arise from a transaction with the debtor-in-possession; the consideration supporting the right to payment must be beneficial to the debtor-in-possession in operating its business. *Calpine Corp. v. O'Brien Environmental Energy, Inc.,* 181 F.3d 527, 532–33 (3d Cir.1999).

■■ Not just any benefit to the bankruptcy estate will suffice for purposes of § 503(b)(1)(A). The benefit conferred must be substantial and direct. *Microsoft Corp. v. DAK Industries, Inc. (In re DAK Industries, Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995).

■■■ The burden of proving entitlement to administrative priority in accordance with § 503(b)(1)(A) is a "heavy" one. *O'Brien Environmental Energy,* 181 F.3d at 533. The provision should be narrowly

construed. *DAK Industries,* 66 F.3d at 1094.

■ The concept of a "necessary" cost or expense is "somewhat broader" than a dictionary definition might suggest. Costs and expenses so qualifying are not limited to costs and expenses which are *sine quibus non* for a debtor's rehabilitation; cost and expenses that are "ordinarily incident" to operating a debtor-in-possession's business also may qualify. *Tri–State Clinical Laboratories,* 178 F.3d at 689.

■ Read in its entirety, § 503(b) involves a *quid pro quo* whereby the bankruptcy estate incurs a post-petition obligation in return for some consideration required for the operation of the business or the rehabilitation of the estate. *Id.,* 178 F.3d at 689–90.

■ Except for $67,350.92 Ideal spent to pay debtor's past-due rent, utilities and the like, Ideal's request that the costs and expenses it incurred while operating the business is fatally flawed and must be denied.[1]

Ideals' assertion that it is entitled to an allowed administrative expense under § 503(b)(1)(A) for the remaining $355,537.19 it spent in connection with operating the business is based on the *erroneous* proposition that debtor's business was on-going when Ideal took it over on January 2, 2005. Because it was not on-going at that time, Ideal's assertion that it preserved its value *as a going concern—* and thereby enhanced its sale value—is incorrect.

The record created in this matter clearly establishes that debtor had terminated its business operations on December 17, 2004, approximately two weeks before Ideal took over[2], and had no intention of resuming operations after it shut down.

Carco Finance and Ideal disagree as to whether the asset purchase agreement was ever effective and whether debtor and Ideal were ever bound by its provisions. We need not resolve this dispute to decide the present matter. Whether or not the asset purchase agreement was ever effective, it presents a clear picture concerning what debtor and Ideal *intended* when they executed the asset purchase agreement.

Review of the asset purchase agreement compellingly indicates that after debtor shut down on December 17, 2004, it had no intention of ever resuming operations and once again becoming a going concern. When Ideal operated the business, it did so for the purpose of enhancing the value of what it considered was *its* business.

Nothing in the asset purchase agreement indicates that debtor intended to resume its business after shutting it down. To the contrary, § 12.3 expressly provided that debtor was not required to actively operate the business and recall its employ-

---

1. As was noted previously, Carco Finance *concedes* that Ideal is entitled to an allowed administrative expense for the costs and expenses Ideal incurred in paying past-due post-petition rent, utilities and the like. When we say that Ideal's request is "fatally flawed", we are referring only to the *remaining* $355,537.19 in costs and expenses Ideal incurred while operating the business in January of 2005.

2. When Ideal took over the business, Ideal did so believing that the asset purchase agreement of December 30, 2004, was a "done deal" and that it was entitled to operate the business without obtaining prior Court approval. According to Ideal, the law firm it retained to draft the asset purchase agreement and an attorney versed in bankruptcy law had advised Ideal that it could take over the business prior to obtaining approval from this Court. They allegedly advised Ideal that Court approval of the asset purchase agreement was a "mere formality". To the extent that these matters are relevant here, we find it implausible that Ideal was so advised.

ees prior to the anticipated closing on the sale to Ideal.

In addition, § 10.6 of the asset purchase agreement provided that Ideal was not required to operate debtor's business prior to the anticipated closing. Ideal instead had sole discretion concerning the extent, method and manner in which it operated the business. If Ideal hired any of debtor's terminated employees, they were to be employees of Ideal rather than debtor.

These provisions lead us to infer that it was for Ideal alone to decide whether to resume debtor's business. If Ideal elected to do so, Ideal did so at its own cost and for its own benefit, not for the benefit of the bankruptcy estate.

This inference is reinforced by § 9.2 of the asset purchase agreement. It provided that if Ideal operated the business prior to the anticipated closing, Ideal would hold debtor harmless for any costs or expenses Ideal incurred. Debtor and Ideal intended, in other words, that if Ideal elected to operate the business prior to the closing, it did so at its own risk and would not look to the bankruptcy estate to bear the costs and expenses of its so doing.

Additional support for this inference is found in § 13.2 of the asset purchase agreement. It expressly provided that if Ideal utilized debtor's assets on or after January 2, 2005, Ideal did so *for its own account* and in accordance with § 9.2 of the agreement.

Ideal's president testified under oath that Ideal operated the business as it did with the consent of debtor, which asked Ideal to complete orders that were outstanding when debtor shut down on December 17, 2004. This self-serving testimony is not credible and is contrary to the above provisions of the asset purchase agreement. We see no reason to believe that debtor agreed to one thing in the asset purchase agreement and orally agreed to something contrary to the provisions of the agreement. This testimony perhaps would have been more credible had someone from debtor who was involved in the negotiations with Ideal so testified.

The only direct benefit Ideal conferred on the bankruptcy estate arose when it paid debtor's past-due post-petition rent, utilities and the like. The total amount of these expenditures is $67,350.92. Carco Finance, we noted previously, concedes that these costs qualify as administrative expenses for purposes of § 503(b)(1)(A). Had Ideal not paid these bills, the landlord, utility companies and the like would have been entitled to such treatment. Debtor's confirmed plan specified that all allowed administrative expenses were to be paid in full from the net proceeds of the sale of debtor's assets before Carco Finance received anything.

Ideal's assertion that the remaining $388,537.19 in costs it incurred are entitled to administrative priority in accordance with § 503(b)(1)(A) fails for additional reasons.

For a cost or expense to qualify for such treatment, it must arise from a transaction with the debtor. *O'Brien Environmental Energy*, 181 F.3d at 532–33. The remaining costs Ideal incurred did *not* arise from a transaction it had with debtor. They instead arose as a result of Ideal's erroneous belief that it could take over the business without prior court approval and that the asset purchase agreement was a "done deal".

While Ideal unquestionably "transacted" with debtor when they executed the asset purchase agreement on December 30, 2004, it is incorrect to say that Ideal incurred the remaining costs as a result of that transaction. We have determined that the asset purchase agreement did not

require debtor or Ideal to operate the business until the anticipated closing occurred. If Ideal elected to operate the business, it did so at its own risk and for its own account and agreed to hold debtor harmless for any costs it incurred.

One might argue that what counts in deciding this matter is not what debtor and Ideal intended, but instead whether Ideal *in fact* increased the value of debtor's assets by continuing to operate the business. This assertion is without merit.

Regardless of what debtor and Ideal intended about Ideal's taking over the business and operating it, Ideal has *not* demonstrated to our satisfaction that its actions in fact enhanced the value of debtor's assets by maintaining the business as a going concern.

Ideal would have us conclude that the business was worth more as a result of its efforts than if it had not taken over and operated the business. We are not willing to so conclude in this instance. Whereas Ideal apparently regards this proposition as self-evidently true, we do not. In our estimation, it is just as likely that Ideal's agreement to purchase debtor's assets for $700,000 was well below its true market value as it is that Ideal enhanced the value of the assets by operating it. Ideal offered no evidence which would tend to show that the latter is more probable than is the former.

What we know about debtor's assets suggests that Ideal's actions did nothing to enhance their value. Perhaps debtor's most valuable asset was the sophisticated software it had devised to operate motion simulators and other devices it manufactured. There is no compelling reason to infer that Ideal's taking over of the business enhanced the value of the software. The value of the software depended on what it could do. Whether or not the business remained in operation until the sale occurred contributed nothing to its value.[3]

We conclude in light of the foregoing that Ideal is not entitled to an administrative expense in accordance with § 503(b)(1)(A) for the costs it incurred while it operated debtor's business beginning on January 2, 2005, and ending on February 2, 2005.

### (II.) § 503(b)(3)(D).

Ideal asserted for the first time in its post-trial brief that it also is entitled to an administrative expense in accordance with § 503(b)(3)(D), which provides in part as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses ..., including—....
>
> > (3) ... actual, necessary expenses ... incurred by—....
> >
> > > (D) a creditor ... in making a substantial contribution in a case under chapter ... 11 of this title....

11 U.S.C. § 503(b)(3)(D).

Although Ideal did not raise this matter until after the matter was tried, for the

---

**3.** The possibility exists that Ideal's actions *diminished* rather than enhanced the value of the business. Acutronic has brought a motion to hold Ideal in contempt for disobeying our order of January 21, 2005, in which we prohibited Ideal from appropriating any of debtor's assets and directed it to return any assets it had removed from the premises. Acutronic claims that after the sale took place on February 2, 2005, Ideal copied for use in its own business the software that Acutronic purchased at the sale.

This matter has yet to be heard and decided. We take no position at this time as to whether the allegations made by Acutronic are true. If they are true, Ideal may have diminished the value of debtor's assets by copying the software and using it in its business.

sake of thoroughness we will address the merits of the claim that it is entitled to an administrative expense in accordance with this provision.

■ Costs and expenses incurred by a creditor [4] are presumed to be incurred for the benefit of the creditor. Such costs and expenses are reimbursable from the bankruptcy estate if and only if they directly and materially contributed to debtor's reorganization. *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937, 943–44 (3d Cir. 1994).

■ The test for determining whether § 503(b)(3)(D) applies is whether the applicant's efforts produced an actual and demonstrable benefit for the estate and its creditors. *Id.* For a contribution to qualify as "substantial", it must be more than an incidental contribution that arose from actions the applicant has taken in furtherance of its own interest. An applicant is presumed to have acted in furtherance of its own interest until it satisfies the court that its actions transcended self-interest. The term "substantial contribution" should be applied in a manner that excludes reimbursement for actions taken primarily to serve the applicant's interest and which it would have taken absent an expectation of reimbursement from the bankruptcy estate. *Id.*

■ Applying these precepts to the facts of this case, we reject Ideal's assertion that it is entitled pursuant to § 503(B)(3)(D) to an allowed administrative expense for the remaining $388,537.19 in costs and expenses it incurred. Two reasons for so concluding in particular stand out.

As was determined previously, we are not persuaded that Ideal's actions enhanced the value of debtor's assets. Ideal did not establish that the increase in the purchase price for debtor's assets from $700,000 to $1,800,000 is attributable to its actions. It is not "self-evident" that Ideal deserves credit for the increase.

Moreover, we previously determined that Ideal's actions in operating the business were motivated by its desire to further its own interest. Because it erroneously believed that the asset purchase agreement was a "done deal" and court approval thereof was a "mere formality", Ideal incurred the above expenses *without any expectation of reimbursement by the bankruptcy estate*. Ideal's request for an allowed administrative expense was an after-the-fact contrivance it came up with only *after* Acutronic was the successful bidder for debtor's assets. We have no doubt that when Ideal incurred the above expenses, it did not anticipate *at that time* seeking reimbursement of its costs and expenses from this bankruptcy estate.

We conclude in light of the foregoing considerations that § 503(b)(3)(D) does not provide a basis for granting Ideal an allowed administrative expense.

*(III) Fairness And Equity.*

One final matter should be addressed at this time.

Ideal asserts that Carco Finance will be unjustly enriched if its request for an allowed administrative expense is denied. Fairness, Ideal maintains, dictates that its

---

**4.** The question might be asked whether, except for the past-due post-petition rents, utilities and the like it paid, Ideal qualifies as a creditor rather than as an intermeddler who incurred the costs and expenses it did in the erroneous belief that it was operating the business as its own. Even if we assume for the sake of argument that Ideal qualifies as a creditor in this regard, its request for an administrative expense under § 503(b)(3)(D) falls well short of the mark.

request be granted. This assertion lacks merit.

In our estimation, fairness does *not* dictate that Ideal be granted an allowed administrative expense for the costs and expenses it incurred while it operated the business in January of 2005. Denying its request for an allowed administrative expense is not unfair to Ideal.

Everything Ideal did in this instance was based on its erroneous belief that the asset purchase was a "done deal". Its actions were based entirely on its desire to further its own interest. Even if Ideal's actions in some way were beneficial for the bankruptcy estate, that benefit was an unintended and wholly coincidental by-product of its actions. Fairness does not require that Ideal be granted an administrative expense for actions which by happenstance benefitted the bankruptcy estate.

Even if we were inclined to "make things right" for Ideal, we lack the power to do so.

It long has been recognized that a bankruptcy court is a court of equity. See, for instance, *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). As a court of equity, a bankruptcy court has broad authority to modify debtor-creditor relationships when equity so demands. *Pepper v. Litton*, 308 U.S. 295, 303–04, 60 S.Ct. 238, 243–44, 84 L.Ed. 281 (1939).

A bankruptcy court may "issue any order, process or judgment that is necessary to carry out the provisions of the Bankruptcy Code." 11 U.S.C. § 105(a). Its equitable powers, however, are not unfettered. In spite of its seemingly open-ended language, § 105(a) is limited in its scope. It does not, for instance, permit a bankruptcy court to create substantive rights that otherwise would not be available under the Bankruptcy Code. *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 211 (3d Cir.2000).

We have determined that Ideal is not entitled to an administrative expense in accordance with § 503(b)(1)(A) or § 503(b)(3)(D). Equitable considerations may not be used to provide the relief Ideal requests when the statutory provisions upon which its request is based are not satisfied. A bankruptcy court's equitable powers may not be used in derogation of the provisions of the Bankruptcy Code. Such powers "must and can only be exercised within the confines of the Bankruptcy Code". *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988).

An appropriate order shall issue.

## ORDER OF COURT

AND NOW, this *25th* day of *July*, 2006, in accordance with the foregoing memorandum opinion, it hereby is ORDERED, ADJUDGED and DECREED that the motion by Ideal Aerosmith, Inc. for an allowed administrative expense in the amount of $455,708.05 be and hereby is GRANTED IN PART and DENIED IN PART.

Ideal Aerosmith's request for administrative expense be and hereby is ALLOWED in the amount of $67,350.92. It's request for an administrative expense for the remaining $355,357.19 be and hereby is DISALLOWED.

It is SO ORDERED.