

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-2-1999

# Comm PA Dept Env Res v. Tri State Clinical

Precedential or Non-Precedential:

Docket 98-3332

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Comm PA Dept Env Res v. Tri State Clinical" (1999). *1999 Decisions.* Paper 147.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/147

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 2, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3332

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL RESOURCES,

        Appellants,

v.

TRI-STATE CLINICAL LABORATORIES, INC.,
JOSEPH NIGRO, Trustee,

        Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Civil Action No. 97-cv-02115
District Judge: Hon. Donald J. Lee

Argued: January 26, 1999

Before: SLOVITER, MCKEE, and RENDELL,
Circuit Judges.

(Filed June 2, 1999)

        Stuart M. Bliwas, Esq. (Argued)
        Pennsylvania Department of
        Environmental Resources
        Office of Chief Counsel
        400 Market Street, P.O. Box 8464
        Harrisburg, PA 17105

         Attorney for Appellant

James M. Malley, Esq.
Joseph P. Nigro, Esq.
Matthew M. Pavlovich, Esq. (Argued)
Nigro & Malley
2 Gateway Center, Suite 1270
Pittsburgh, PA 15222

 Attorneys for Appellees

Rachel J. Lehr, Esq.
Office of Attorney General of N.J.
25 Market Street
Trenton, N.J. 08625

 Attorney for Amicus-Appellant

OPINION OF THE COURT

McKEE, Circuit Judge.

We are asked to decide if a criminal fine is entitled to priority as an administrative expense under Chapter 7 of the Bankruptcy Code. The fine was imposed upon a debtor in possession for post-petition conduct that violated Pennsylvania's Solid Waste Management Act. Pennsylvania's Department of Environmental Resources ("DER") filed a proof of claim in which it asserted that it was entitled to have the fine paid as an administrative expense under S 503(b) of the Bankruptcy Code. The bankruptcy court disagreed, and sustained the trustee's objection to the proof of claim. The district court affirmed. We hold that a post-petition criminal fine is not an administrative expense under Chapter 7, and therefore we affirm.

I. Factual Background and Procedural History

On August 14, 1990, Tri-State Clinical Laboratories, Inc. filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. A few months later, on October 4, 1990, two municipal workers were sprayed with blood while emptying a dumpster located behind Tri-State's place of business. The blood came from test tubes that Tri-State

2

had illegally placed in the dumpster. The test tubes would have been collected and deposited in a municipal landfill had they not been discovered.

On January 21, 1992, the Office of Attorney General filed a criminal complaint charging Tri-State with violations of Pennsylvania's Solid Waste Management Act for illegally disposing of infectious waste. Count I of the complaint charged Tri-State with unlawfully storing municipal waste on or about July 18, 1990 (before Tri-State hadfiled its Chapter 11 petition). Count II charged Tri-State with unlawfully disposing of infectious waste in the dumpster on or about October 4, 1990 (after Tri-State had filed its Chapter 11 petition).

On September 10, 1992, Joseph P. Nigro was appointed Chapter 11 Trustee. Shortly thereafter, on October 6, 1992, the case was converted to Chapter 7, and Mr. Nigro was appointed the Chapter 7 Trustee.

On July 28, 1994, while the Chapter 7 proceedings were still pending, the Court of Common Pleas of Westmoreland County convicted Tri-State on Counts I and II of the complaint and imposed a fine of $10,000 for the violation charged in Count I, and a fine of $20,000 for the violation charged in Count II. It is undisputed that thesefines were punitive in nature, and unrelated to actual costs or expenses incurred by the DER.

On August 19, 1994, the DER filed a proof of claim asserting a $10,000 subordinated unsecured claim under 11 U.S.C. S 726(a)(4); and a $20,000 claim for administrative expenses pursuant to 11 U.S.C. SS 503(b), 507(a)(1), and 726(a)(1).1 The trustee objected to treating the $20,000 fine as an administrative expense. However, there was no objection to allowing the $10,000 claim for pre-petition conduct under 11 U.S.C. S 726(a)(4), and that fine is not an issue in this appeal.

The bankruptcy court concluded that administrative expenses must be claimed by filing a "request for payment," and not by filing a "proof of claim." Accordingly, the

_____

1. The bankruptcy court had previously granted the DER's motion to file a proof of claim beyond the bar date.

3

bankruptcy court held that "[its previous] order granting the DER leave to file its proof of claim beyond the bar date is, in effect, a nullity." In the alternative, the court held that the $20,000 fine for post-petition criminal conduct is not an administrative expense under S 503(b). Instead, the court allowed the DER to pursue the fine as an unsecured claim.

The district court subsequently affirmed the bankruptcy court's determination that the $20,000 fine was not an administrative expense. Thus, it was not necessary for the district court to decide if it agreed with the bankruptcy court's conclusion that an administrative expense must be asserted in a request for payment, rather than a proof of claim. This appeal followed.2

II. Discussion

A.

The DER contends that the $20,000 fine imposed upon the debtor in possession for conduct that occurred after it filed the petition must be given priority status as an

_____

2. The district court's appellate jurisdiction was based on 28 U.S.C. S 158(a). We have jurisdiction pursuant to 28 U.S.C. S 158(c) and 28 U.S.C. S 1291. We exercise plenary review over a district Court's bankruptcy decision. Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 100 (3d Cir. 1981). "Because the bankruptcy court, rather than the district Court, was the trier of fact in this case, we are in as good a position as the district court to review the findings of the bankruptcy court, so we review the bankruptcy court's findings by the standards the district court should employ, to determine whether the district court erred in its review." In re Fegeley, 118 F.3d 979, 982 (3d Cir. 1997) (internal quotations omitted). Accordingly, we review the bankruptcy court's findings of fact for clear error, and exercise plenary review over legal issues. Id.

Although the parties have briefed the procedural issue of whether an administrative expense can be asserted in a proof of claim, that issue is not properly before us because it is not part of the district court's order.
Moreover, because we conclude that the fines here are not administrative expenses, we need not decide whether the administrative expense claim was properly asserted.

4

administrative expense under S 503(b)(1)(A) of the Bankruptcy Code. The DER bases its argument upon the nonexclusive nature of the list of expenses in S 503(b), and the fact that other courts have held that tort damages, post-petition civil penalties, and civil environmental fines are administrative expenses. The DER insists that there is no rational basis to distinguish those civil penalties from these criminal fines. According to the DER, both must be treated as an "actual necessary expense of preserving the estate" under S 503(b). Appellant's Br. at 10. The DER seeks to bolster this argument with policy considerations. It insists that if criminal fines are not given priority, "Chapter 11 debtors in possession [will be encouraged] to disregard criminal statutes and other valid laws that might impede a debtor in possession's effort to turn a profit," because such a debtor can violate the law "secure in the knowledge that no economic punishment would follow." Appellant's Br. at 23-24. The DER warns that this would "create[ ] an incentive for any marginal corporate business to attempt to free itself from regulatory restraints by seeking the safe haven of Chapter 11 protection." Id. at 24.

The trustee's rejoinder relies heavily upon our decision in Commonwealth of Pennsylvania Dept. of Environmental Resources v. Conroy, 24 F.3d 568 (3d Cir. 1994). 3 The trustee argues that we drew a distinction in Conroy between compensatory assessments which may enjoy priority status as actual administrative expenses, and non-compensatory assessments which do not reimburse creditors for actual expenses. The trustee argues that because Congress expressly refers to non-compensatory criminal fines and penalties elsewhere in the Code, it would have expressly included such fines under S 503(b) if it intended to treat them as administrative expenses. The trustee also adds its own policy "spin" to rebut the policy considerations that the DER urges upon us. The trustee argues that non-compensatory criminal fines survive bankruptcy, and can be assessed against the corporation or

_____

3. Tri-State Clinical Laboratories and the trustee are jointly listed as "appellee" on the briefs and in the caption. Inasmuch as we are deciding the validity of the trustee's objection in the bankruptcy court we will refer to the appellee as the "trustee."

5

corporate officers individually. Thus, those who are responsible for the operation of the business have no incentive to cut costs by violating the law as the DER suggests. Appellee's Br. at 24-25.

B.

The starting point of any statutory analysis is the language of the statute. Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 557-58 (1990); Kelly v. Robinson, 479 U.S. 40, 43 (1986). Thus, we begin at the beginning by examining the text of the statute. In doing so, "we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Kelly, 479 U.S. at 43 (internal quotation marks omitted).

Section 503(b)(1)(A) of the Bankruptcy Code provides:

>  (b) [T]here shall be allowed, administrative expenses, . . . including --

>  (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case . . .

11 U.S.C. S 503(b)(1)(A) (1997). Thus, for a claim to be given priority as an administrative expense under this provision of the Code, it must be (1) a "cost" or "expense" that is (2) "actual" and "necessary" to (3) "preserving the estate."

We construe the words of a statute according to their ordinary meaning, unless the context suggests otherwise. See Moskal v. United States, 498 U.S. 103, 108 (1990); Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998). In Reading Co. v. Brown, the Supreme Court concluded that "the words `preserving the estate' include the larger objective, common to arrangements, of operating the debtor's business with a view to rehabilitating it." 391 U.S. 471, 476-77 (1968). The dictionary defines "necessary" as "absolutely required" or "needed to bring about a certain effect or result." Webster's II New Riverside University Dictionary 787 (1994). However, the Supreme Court has held that the concept of "necessary costs" under

6

the Code is somewhat broader than would be suggested by the dictionary definition. Thus, " `usual and necessary costs' should include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." Reading, 391 U.S. at 483.

To determine Congress' intent in enacting S 503(b)(1)(A), we also must consider the other provisions of S 503. See Neal v. Clark, 95 U.S. 704, 708-09 (1978) ("a word is known by the company it keeps"). Section 503(b) specifically lists several expenditures that are included within the meaning of "administrative expenses." These include certain taxes and fines or penalties that relate to those taxes, id. at S 503(b)(1)(B) & (C); compensation for services rendered by trustees and indenture trustees, id. at S 503(b)(2) & S 503(b)(5); the actual, necessary expenses incurred by certain creditors pressing their claims, id. at S 503(b)(3); reasonable compensation for the professional services of attorneys and accountants who provide particular services, id. at S 503(b)(4); and other specified fees and mileage, S 503(b)(6). These specified administrative expenses all describe compensation for services that are necessarily incident to the operation of a business, see, e.g., S 503(b)(2), (4) & (5), or reimbursement for actual expenses incurred, see, e.g., S 503(b)(3) & (6).4 Moreover, paragraph

_____

4. Although taxes incurred by the estate, as well as fines and penalties relating to those taxes, are expressly included in S 503's definition of administrative expense, taxes are treated uniquely throughout the Bankruptcy Code, and the policies underlying the treatment of taxes do not apply to other debts and expenses. Thus, the inclusion of taxes and tax penalties in this section is not particularly helpful to our analysis. Indeed, to the extent that the express reference to tax penalties in S 503 implies anything, it implies that Congress did not intend to include non-compensatory criminal fines and penalties within the category of "administrative expenses." Pursuant to well-established canons of construction, the fact that Congress expressly included tax fines and penalties in S 503 implies that had Congress intended to include other types of fines and penalties within the class of administrative expenses, it would have done so expressly. See Bates v. United States, 522 U.S. 23 (1997) (" `[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.' ") (quoting Russello v. United States, 464 U.S. 16, 23 91983) (other internal quotation marks omitted)).

7

(1)(A) designates "wages, salaries, or commissions for services rendered after the commencement of the case" as "actual, necessary costs and expenses of preserving the estate." See S 503(1)(A) (emphasis added). Thus, the language of S 503(b), read as a whole, suggests a quid pro quo pursuant to which the estate accrues a debt in exchange for some consideration necessary to the operation or rehabilitation of the estate. Priority, therefore, is afforded such expenses to compensate the providers of necessary goods, services or labor.

Such a construction is supported by the purposes of the Bankruptcy Code. Chapter 11 is intended to "rehabilitat[e] the debtor and avoid[ ] forfeiture by creditors." Pioneer Investment Services, 507 U.S. at 389. The drafters of the Code recognized that to achieve that purpose, the debtor has to continue to operate between the filing of the petition and the adjudication of bankruptcy. This can result in additional expenses that are necessary to the continued operation of the business or to successfully winding it down. Congress recognized this need to provide an incentive to creditors who otherwise would not continue to provide services to a failing business. Accordingly,"the actual, necessary costs and expenses of preserving the estate" are given priority under the Code. See H.R. Rep. No. 95-595, at 186-187 (1977) reprinted in 1978 U.S.C.C.A.N. 5963, 6147 ("Those who must wind up the affairs of a debtor's estate must be assured of payment, or else they will not participate in the liquidation or distribution of the estate."); id. at 187, 1978 U.S.C.C.A.N. at 6147-6148 ("The purpose of [giving priority to wages earned within three months before bankruptcy,] as with the administrative expense priority, is in part to ensure that employees will not abandon a failing business for fear of not being paid."); Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. 93-137, pt. 1, at 214 (1973) [hereinafter "Commission Report to the House"] (recommending priority status for administrative expenses incurred during the reorganization period because"[s]uch expenses must be paid first to assure the availability of the services needed to administer a liquidation or reorganization case."). Absent the priority established under S 503, a debtor in possession could not keep its employees,

8

nor obtain services necessary to its operation as it attempts to reorganize, or wind-down pending ultimate liquidation. We believe the relevance of this consideration extends to interpreting Congress' intent in according priority to certain claims under Chapter 7.

The Supreme Court's holding in Reading illustrates these principles. In Reading, I. J. Knight Realty Corporation filed a petition for an arrangement under Chapter 11 of the Bankruptcy Act which was then in effect.[5] The district court appointed a receiver, and authorized him to continue to conduct the debtor's business of leasing an industrial building. Thereafter the building was totally destroyed by a fire which spread to the surrounding property. In a resulting tort action, one of the adjacent property owners recovered a judgment against the receiver in an effort to obtain compensation for the damage the fire inflicted upon its property as a result of the receiver's negligence. Because the debtor in possession was in bankruptcy, an issue arose as to the priority that the judgment should be accorded against the bankrupt estate. The Supreme Court held that the tort judgment was entitled to priority as an administrative expense under S 64a(1) of the Bankruptcy Act, 11 U.S.C. S 104(a)(1), even though the expense was not technically a cost of preserving the estate.[6]

The Court's holding was motivated by the considerations of fairness and practicality which underlie the purposes of the bankruptcy laws. The Court believed that those who continue to transact business with the debtor during the Chapter 11 case, and who suffer financially as a result, are entitled to priority over other creditors who have not affirmatively assumed such risk. The Court reasoned that

_____

5. The prior Bankruptcy Act is analogous to the current version.

6. Section 64a of the prior Bankruptcy Act defined administrative expenses in relevant part as follows:

> The debts to have priority, in advance of the payment of dividends to creditors and to be paid in full out of bankrupt estates, and the
> order of payment, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent tofiling the petition
> . . . .

fairness dictates that those injured by the operation of a bankrupt business by a receiver acting within the scope of his authority be compensated for the injury. The Court concluded that it simply is not fair to deny innocent victims compensation for injuries they would not have incurred had the law not allowed the debtor to continue operating its business. Because Reading is so important to our inquiry we take the liberty of quoting the Court's opinion at length. The Court stated:

> In our view the trustee has overlooked one important, and here decisive, statutory objective: fairness to all persons having claims against an insolvent. Petitioner suffered grave financial injury from what is here agreed to have been the negligence of the receiver and a workman. It is conceded that, in principle, petitioner has a right to recover for that injury from their `employer,' the business under arrangement, upon the rule of respondeat superior. Respondents contend, however, that petitioner is in no different position from anyone else injured by a person with scant assets: its right to recover exists in theory but is not enforceable in practice.

> That, however, is not an adequate description of petitioner's position. At the moment when an arrangement is sought, the debtor is insolvent. Its existing creditors hope that by partial or complete postponement of their claims, they will through successful rehabilitation, eventually recover from the debtor either in full or in larger proportion than they would in immediate bankruptcy. Hence the present petitioner did not merely suffer injury at the hands of an insolvent business: it had an insolvent business thrust upon it by operation of law. That business will, in any event, be unable to pay its fire debts in full. But the question is whether the fire claimants should be subordinated to, should share equally with, or collect ahead of those creditors for whose benefit the continued operation of the business (which unfortunately led to the fire instead of the hoped-for rehabilitation) was allowed. . . . The `master,' liable for the negligence of the `servant' in this case was the

10

business operating under Chapter XI arrangement for the benefit of creditors and with the hope of rehabilitation. That benefit and that rehabilitation are worthy objectives. But it would be inconsistent both with the principle of respondeat superior and with the rule of fairness in bankruptcy to seek these objectives at the cost of excluding tort creditors of the arrangement from its assets, or totally subordinating the claims of those on whom the arrangement is imposed to the claims of those for whose benefit it is instituted.

* * *

 In considering whether those injured by the operation of the business during an arrangement should share equally with, or recover ahead of, those for whose benefit the business is carried on, the latter seems more natural and just. Existing creditors are, to be sure, in a dilemma not of their own making, but there is no obvious reason why they should be allowed to attempt to escape that dilemma at the risk of imposing it on others equally innocent.

391 U.S. at 477–83.

The Court also considered the practical consequences of not allowing the tort claimant to recover ahead of other creditors.

More directly in point is the possibility of insurance. An arrangement may provide for suitable coverage, and the Court below recognized that the cost of insurance against tort claims arising during an arrangement is an administrative expense payable in full under S 64a(1) . . . It is . . . obvious that proper insurance premiums must be given priority, else insurance could not be obtained; and if a receiver or debtor in possession is to be encouraged to obtain insurance in adequate amounts, the claims against which insurance is obtained should be potentially payable in full.

Id. at 483.

Thirdly, the Court considered the background of tort law.

11

It has long been the rule of equity receiverships that torts of the receivership create claims against the receivership itself; in those cases the statutory limitation to "actual and necessary costs" is not involved, but the explicit recognition extended to tort claims in those cases weighs heavily in favor of considering them within the general category of costs and expenses.

Id. at 485. The Court concluded that, because the torts of a receivership create claims against the receiver, it could not distinguish between claims arising from conduct which is integral to the operation of the business, and torts arising from "nonessential" activity.

No principle of tort law of which we are aware offers guidance for distinguishing, within the class of torts committed by receivers while acting in furtherance of the business, between those "integral" to the business and those that are not. . . . We hold that damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to "actual and necessary costs" of a Chapter XI arrangement.

Id. Inasmuch as the receiver was acting within the scope of its authority, the demands of fair compensation required that persons who were injured by the receiver's negligence be compensated. This, in turn, required giving their claims priority over the claims of other creditors.[7]

Here, allowing the DER's claim to be treated as an administrative expense will allow that claim to be paid to the exclusion of, and out of the resources otherwise

_____

7. We realize that the debtor in Reading was seeking an arrangement under Chapter 11, and the Court reached its holding in that context. Here, of course, the defendant initially filed for the contemporary counterpart of an arrangement -- a reorganization-- under Chapter 11, and the case was thereafter converted to a liquidation ("straight bankruptcy" using the terms of the prior Bankruptcy Act). However, we think this is a distinction without a difference. In Reading the Court noted: "It is agreed that this section [64a] applicable by its terms to straight bankruptcies, governs payment of administration expenses of Chapter XI arrangements". 391 U.S. at 475.

available for, claims of other creditors. The practical result would be that fines for committing crimes would be paid by innocent third persons -- the creditors -- rather than Tri-State -- the criminal. That is as unfair as it is impractical. The payment of the criminal fine would not compensate for any damages resulting from Tri-State's conduct. It would merely cause Tri-State to satisfy its obligations to the state out of the pockets of Tri-State's creditors.

The DER argues that the cost of complying with the criminal laws is a necessary cost of doing business (no less than taxes, wages, or fees), and therefore any criminal penalties in the form of fines resulting from violating the law must be treated as an administrative expense. Thus, the DER would have us hold that a violation of a criminal law intended to protect public safety is necessary or ordinarily incident to operating a business, and therefore, is incurred as an expense of "preserving the estate." However, the DER fails to recognize that, even if the costs associated with operating a business in accordance with the law are necessary to preserving the estate, it does not follow that criminal fines and the conduct they attempt to punish are ordinarily incident to operating a business. We refuse to adopt an analysis of administrative expenses that is based upon the assumption that legitimate businesses engage in a "cost-benefit" analysis to determine if they will comply with criminal laws that protect the very public that the owners and operators of those legitimate businesses are part of. It is neither reasonable nor necessary for a commercial enterprise to violate criminal laws and endanger the public to preserve the estate or to conduct legitimate business operations, and we refuse the DER's invitation to hold otherwise. Rather, we believe Congress intended only for those "actual necessary costs and expenses" that arise in the context of, or compensate for, legitimate business activity, or the losses resulting therefrom, to be treated as expenses of preserving the estate, and accorded priority as an administrative expense.

Although both parties to this appeal rely upon our holding in Conroy, supra, to support their arguments, we view Conroy as supporting the distinction we draw between claims for compensatory expenses and those for criminal

13

fines. In Conroy, the DER filed a claim for reimbursement for costs incurred in cleaning up hazardous chemicals at a site the Chapter 11 debtors had attempted to abandon. In holding that those costs were administrative expenses entitled to priority we said:

> [I]f the DER had not itself undertaken to clean up the [site,] the Conroys could not have escaped their obligation to do so by abandoning the hazardous property in question. Furthermore, if Frank Conroy had arranged for cleanup of the facility after he had filed a Chapter 11 petition, the costs of this cleanup would have constituted administrative expenses under 11 U.S. C. S 503(b)(1)(A), since they are a portion of `the actual, necessary costs and expenses of preserving the estate.'

Id. at 569. We also held that reimbursement for that portion of the administrative and legal costs incurred in arranging for cleanup which the DER had "sufficiently substantiated" as reasonable compensation also qualified as an administrative expense. Id. at 570-71. By cleaning up the site, the DER provided a service to the debtor-- a service that the debtor itself would have had to perform during the course of normal operations -- and therefore, the DER was entitled to compensation for that service.

The situation here is quite different. Tri-State was not required to endanger the health and welfare of residents of the community by illegally disposing of test tubes containing blood, and the sanction that was imposed as punishment for doing so has nothing to do with compensation or proper business operations. Rather the purpose of this criminal fine is deterrence, retribution, and punishment.

C.

Our conclusion is also consistent with the legislative history relating to the classification of non-compensatory criminal fines and penalties. Before Congress replaced the Bankruptcy Act of 1898 with the current Bankruptcy Code, a creditor had to show that a claim was both "allowable" (under S 57 of that Act), and "provable" (under S 63 of that

Act) before the creditor could participate in the distribution of assets at all. See H.R. Doc. 93-137, pt. 1, at 21 (1973); Kelly v. Robinson, 479 U.S. 36, 44-45 (1986). Section 57(j) specifically excluded criminal penalties from the class of allowable debts insofar as they did not compensate for an actual loss. Section 57(j) of the Act provided:

> Debts owing to the United States, a State, a county, a district, or a municipality as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose.

30 Stat. 561 (emphasis added). Section 63 defined "provable" debts to include criminal penalties. Thus, by the early 1970s, when Congress began reexamining the bankruptcy laws, it was well established that criminal fines were not allowable debts subject to distribution from the estate under Chapter 7.8

In 1973, the Commission on the Bankruptcy Laws of the United States, which was established to propose changes to the bankruptcy laws, recommended combining the concepts of "allowable" and "provable" claims into a single enlarged class of "allowable" claims. H.R. Doc. No. 93-137, pt.1, at 21. The Commission also recommended subordinating certain claims to other unsecured claims within that large class. Among this class of subordinated claims were claims specified in S 4-406(a) of the proposed bill, including "any claim, whether secured or unsecured, to the extent it is for a fine, penalty or forfeiture or for multiple, punitive or exemplary claims." Id. at 22 and pt. 2, at 115. The Commission recommended changing the law to subordinate such claims, rather than disallowing them, "to prevent the debtor from obtaining a windfall of a disallowance intended only to benefit its creditors." The Bankruptcy Reform Act: Hearings on S. 235 and S. 236 Before the Subcomm. on

---

8. Tri-State's bankruptcy is an example of the frequency with which cases begun under Chapter 11 eventually convert to Chapter 7. We do not think that the conversion from Chapter 11 to Chapter 7 alters our analysis. See Reading, supra (noting that the provisions for straight bankruptcies govern priority under an arrangement under the prior Code).

Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong. 761 (1975) [hereinafter "Hearings S. 235"]. In that same Report, the Commission also recommended establishing three categories of priority claims: (1) administrative expenses, which the Commission explained "must necessarily be given first priority in order for estates to be liquidated and any distributions made to any creditors"; (2) wages; and (3) taxes accruing within one year prior to bankruptcy. H.R. Doc. 93-137, pt.1, at 21.

Based on the Commission's recommendations, the House and the Senate drafted bills which provided for subordinating and prioritizing certain kinds of claims. The relevant provision, which was set forth in S 4-406 in both bills, expressly subordinated any claim for a fine, penalty, or multiple, punitive, or exemplary damages. See H.R. 10792, 93rd Cong. (1973); S. 236, 94th Cong. (1975). In prepared remarks before the Senate subcommittee drafting the proposed legislation, the Commission explained that this subordination "is derived from sec. 57 of the present Act which disallows fines, penalties, and forfeitures owing the government. This provision simply subordinates. It won't change the result in many cases but prevents any return to a solvent debtor who has incurred a penalty and extends the principle to exemplary and [sic] damages." Hearings S. 235 at 15 (emphasis added).

In drafting the current Bankruptcy Code, Congress considered the policy ramifications of subordinating criminal penalties to unsecured debts. During congressional hearings the Assistant Attorney General for the Civil Division of the Department of Justice argued that criminal judgments should not be subordinated, stating: "Fine judgments represent a solemn judgment rendered against a debtor for a crime against society. Thefine debtor has not paid his debt to society until the fine is satisfied. As a matter of public policy such judgments should at least share priority with the Government's non-tax claims and not be subordinated." Hearings S. 235 at 478. The American Life Insurance Association argued to the contrary: "[The Civil Division] overlooks the fact that in a bankruptcy situation, the other creditors in effect end up paying the fine if it is not subordinated. For that reason, it should not

16

be paid out of the estate unless all other claims (subordinated or unsubordinated) are first paid in full." Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong. 1590-91 (1976). Similarly, the Securities and Exchange Commission recommended deleting S 4-406 entirely and substituting in its place S 57(j) of the original Bankruptcy Act, which disallowed fines and penalties. Hearings S. 235 at 736. The SEC favored disallowance over subordination because it feared that subordinated fines and penalties would still take priority over the interests of stockholders. Id.

The statute as enacted did not include a separate section covering subordinated claims. Instead, Congress enacted S 726, "Distribution of property of the estate," which "dictates the order in which [sic] distribution of property of the estate, which has usually been reduced to money by the trustee under the requirements of section 704(1)." S. Rep. No. 95-989, at 96-97 (1978). Section 726 provides in relevant part:

> (a) . . . [P]roperty of the estate shall be distributed--
>
> (1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title [referring to administrative expenses under S 503];
>
> (2) second, in payment of any allowed unsecured claim . . . proof of which is [timely filed under sections 501(a), (b), or (c), or tardily filed under section 501(a)];
>
> (3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) . . .;
>
> (4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

17

(5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

(6) sixth, to the debtor.

11 U.S.C. S 726. The Senate explained paragraph (4) as follows:

Fourth, distribution is to holders of fine, penalty, forfeiture, or multiple, punitive, or exemplary damage claims. More of these claims are disallowed entirely under present law. They are simply subordinated here. Paragraph (4) provides that punitive penalties, including pre-petition tax penalties, are subordinated to the payment of all other classes of claims, except claims for interest accruing during the case. In effect, these penalties are payable out of the estate's assets only if and to the extent that a surplus of assets would otherwise remain at the close of the case for distribution back to the debtor.

S. Rep. No. 95-989 at 97 (emphasis added). Thus, prepetition fines were accorded second class status in the distribution scheme.

This provision works in tandem with S 523 of the current version of the Code, which governs the dischargeability of debts at the conclusion of the bankruptcy proceedings. To understand S 523, however, it is useful to understand its history as well. Section 17 of the old Bankruptcy Act provided that a discharge in bankruptcy released a debtor from all provable debts at the conclusion of the bankruptcy case with four specified exceptions. Although criminal penalties were not excepted from discharge underS 17, courts historically had refused to discharge state criminal penalties under federal bankruptcy because of considerations of comity. See Kelly, 479 U.S. at 44-46. In 1978, Congress codified this judicial exception to dischargeability of criminal fines and penalties in S 523. That section, entitled "Exceptions to Discharge," provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt --

18

> . . . (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, . . .

11 U.S.C. S 523(a)(7); see also FRBP Official Form 18 (9/97), Explanation of Bankruptcy Discharge in a Chapter 7 Case ("Some of the common types of debts which are not discharged in a chapter 7 bankruptcy case are . . .[d]ebts for most fines, penalties, forfeitures, or criminal restitution obligations.").

The Supreme Court explained the evolution of this exception to discharge in Kelly v. Robinson, 479 U.S. 40 (1986). In that case, a defendant was ordered to pay restitution as a condition of probation after pleading guilty to welfare fraud. After she was sentenced, she filed a voluntary petition in bankruptcy under Chapter 7 listing the restitution obligation as a debt. The appropriate state agencies did not file a proof of claim in the court for the outstanding restitution, but the bankruptcy court nevertheless ruled that the restitution payments were not dischargeable under S 523(a)(7) of the Code. The court held that, even though restitution reimburses the victim of criminal activity, its purpose is rehabilitation, and not compensation. Thus, the criminal statute focused" `upon the offender and not the . . . the victim, . . . restitution is part of the criminal penalty rather than compensation for a victim's actual loss.' " Kelly, 479 U.S. at 41. The district court agreed, but the Court of Appeals for the Second Circuit reversed. It held that restitution was a"debt" as that term was defined in the Bankruptcy Code. It relied upon legislative history to conclude that "Congress intended to broaden the definition of "debt" from the narrower definition of the Bankruptcy Act of 1898." Id. The Court of Appeals further concluded that the restitution was discharged under S 523(a)(7), which provides for automatic discharge of certain debts. The Supreme Court reversed, relying in part on an opinion the New York Supreme Court had reached four years before Congress enacted the current Bankruptcy Code. The Supreme Court stated:

> A discharge in bankruptcy has no effect whatsoever upon a condition of restitution of a criminal sentence.

19

A bankruptcy proceeding is civil in nature and is intended to relieve an honest and unfortunate debtor of his debts and to permit him to begin his financial life anew. A condition of restitution in a sentence of probation is a part of the judgment of conviction. It does not create a debt nor a debtor-creditor relationship between the persons making and receiving restitution. As with any other condition of a probationary sentence, it is intended as a means to insure the defendant will lead a law-abiding life thereafter.

Thus, Congress enacted the Code in 1978 against the background of an established judicial exception to discharge for criminal sentences . . . an exception created in the face of a statute drafted with considerable care and specificity.

479 U.S. at 46 (internal quotation marks and citations omitted).

Four years later the Supreme Court elaborated upon the holding in Kelly, and emphasized the extent to which the purpose of the Code was relevant to determining dischargeability. In Pennsylvania Department of Public Welfare v. Davenport, 495 U.S. 552 (1990), the Court held that, even though restitution payments were not discharged under Chapter 7, such payments were dischargeable "debts" under Chapter 13. The Court explained:

[I]n locating Congress' policy choice regarding the dischargeability of restitution orders in S 523(a)(7), Kelly is faithful to the language and structure of the Code: Congress defined "debt" broadly and took care to except particular debts from discharge where policy considerations so warranted. Accordingly, Congress secured a broader discharge for debtors under Chapter 13 than Chapter 7 by extending to Chapter 13 proceedings some, but not all, of S 523(a)'s exceptions to discharge. . . . Among those exceptions that Congress chose not to extend to Chapter 13 proceedings is S 523(a)(7)'s exception for debts arising from a "fine, penalty, or forfeiture." Thus, to construe "debt" narrowly in this context would be to override the

> balance Congress struck in crafting the appropriate
> discharge exceptions for Chapter 7 and Chapter 13
> debtors.

495 U.S. at 562-3.

We conclude that the policy considerations evidenced by the aforementioned legislative history, as well as the text of the Code and the cases interpreting it, support our view that non-compensatory criminal fines imposed on a Chapter 7 debtor or trustee should not be deemed administrative expenses. This interpretation also is consistent with Congress' limitation on the dischargeability of criminal fines and penalties. Under Chapter 7, that portion of a fine that is compensatory is discharged. 11 U.S.C. S 523(7). See Davenport, 495 U.S. at 559 ("The Court in Kelly analyzed the purposes of restitution in construing the qualifying clauses of S 523(a)(7), which explicitly tie the application of that provision to the purpose of the compensation required."). We do not believe that Congress intended for us to ignore the non-compensatory character of a criminal fine in deciding if it is an administrative expense under S 503, while explicitly requiring that consideration under S 523(7). Rather, for the reasons previously stated, we conclude that S 503's restriction to "expenses of preserving the estate" limits such expenses to those that constitute compensation for expenditures necessary to the operation of the debtor-in-possession's business. As we noted above, we will not stretch our policy analysis to include within this category the payment of the criminal fines for Tri-State's conduct here.

We recognize, of course, that Tri-State may not have the funds to pay this fine after the estate is liquidated. However, that is often a possibility when criminalfines are imposed, and we see nothing in the statutes that Tri-State has violated, nor anything endemic to the process of bankruptcy, that would justify us in removing the Commonwealth's hand from the empty pockets of the criminal, and placing it in the pockets of creditors merely because those pockets are deeper. Tri-State was sentenced while in bankruptcy for an act that occurred after it filed its bankruptcy petition. The sentencing judge clearly knew that Tri-State's ability to pay any fine was suspect at best.

21

Yet, the sanction here was on the corporate entity, not upon the responsible individuals. It should not now come as any great surprise that the bankrupt debtor lacks the resources to pay this criminal fine and meet its obligations to creditors. Tri-State's precarious financial condition does not, however, allow us to stretch the concept of administrative expense to remedy the DER's predicament.

D.

Finally, we realize, of course, that there is a certain tension between our analysis here, and the analysis in N.P. Mining Co. v. Alabama Surface Mining Commission, 963 F2d. 1449 (11th Cir. 1992). There, the court held that civil fines imposed solely as punishment for violation of environmental regulations were entitled to priority as an administrative expense under Chapter 11. The holding was based upon the requirement in S 969(b) that the trustee or debtor in possession manage and operate the property in compliance with state law. The court of appeals reasoned that

> [i]f postpetition costs "ordinarily incident to operation of a business" that do not confer a benefit on the estate [the tort claims in Reading] can indeed qualify as "actual, necessary" expenses of preserving the estate, then a strong case can be made that when a licensed business operates in the regulated atmosphere of strip mining in Alabama, incurring regulatory penalties is a cost ordinarily incident to operation of a business and should be accorded administrative-expense priority.

Id at 1454-5.

However, we do not think that rationale applies here, even if it is appropriate for a civil fine on a business in a heavily regulated industry. As noted above, doing so would require us to infer that disposing of infectious human waste in a manner that not only endangers members of the general public, but also constitutes criminal activity, is part of the ordinary and necessary operations of a business. Moreover, the court in N.P. Mining stressed that the violation before it did not involve safety. See N.P. Mining, 963 F.2d at 1458 ("Here, there is no threat to public health

22

or safety."). We are not convinced the court's holding would be the same if it were faced with the kind of reckless conduct in which Tri-State engaged. Finally, the court in N.P. Mining did not consider the extensive legislative history regarding prepetition penalties to be as relevant as we do in determining whether punitive criminal fines should be given preferential treatment. See id. at 1452 (stating "[t]he legislative history of section 503(b) as well as the legislative history of other relevant sections of the Bankruptcy Code, is silent regarding the treatment of punitive post petition penalties"). Accordingly, we are not persuaded by N.P. Mining, the cases upon which it relies, or the cases that have relied upon N.P. Mining. See, e.g. , In re Bill's Coal Company, Inc., 124 B.R. 827 (D. Kan. 1991); In re Charlesbank Laundry, Inc., 755 F.2d 200 (1st Cir. 1985); In re Double B Distributors, Inc., 176 B.R. 271 (Bky. M.D.Fla. 1994); In re Motel Investments, Inc., 172 B.R. 105 (Bky. M.D.Fla. 1994).

III. Conclusion

In sum, based on the plain language of the Bankruptcy Code, its purpose and legislative history, and the principles of fairness upon which the Code is grounded, we hold that punitive criminal fines arising from post-petition behavior are not administrative expenses under 11 U.S.C.S 503(b), and therefore, are not accorded priority status pursuant to S 507(a)(1). Therefore, the orders of the Bankruptcy Court and the District Court will be affirmed in accordance with this decision.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit