OPINION OF THE COURT
 

 ROTH, Circuit Judge.
 

 This bankruptcy appeal presents a question with potentially far-reaching implications for the States’ administration of their criminal justice systems. It is also one of first impression in this Circuit. The issue is whether the debt to a State of a bond surety for a defendant who fails to appear is dischargeable in the surety’s Chapter 7 bankruptcy. We decide the question here only in the context of the case before us: The bond surety is a relative of the non-appearing defendant.
 

 We conclude that the decision of the District Court, holding such a debt dis-chargeable, contradicts the plain meaning of the applicable statute. In light of the problems that such a holding might inflict upon the functioning of the bail release system, we will reverse the District Court’s decision.
 

 I. FACTS
 

 David Nam (David), the son of the debt- or, Gi Nam (Nam), was charged in Philadelphia, Pennsylvania, on September 22, 1997, with a number of offenses, including murder, robbery and burglary in connection with the shooting death of Anthony Schroeder during a March 1997 robbery. Bail was set at $1 million, conditioned on a 10% cash payment by the surety and an agreement by the defendant and the surety to assume legal responsibility for paying the full amount of the bail to the Commonwealth of Pennsylvania. By a Certification of Bail and Discharge, dated January 12, 1998, executed by both Nam and David, Nam agreed to serve as surety for the bail. The operative portion of the Certification reads as follows:
 

 WE THE UNDERSIGNED, defendant and surety, our successors, heirs and assigns, are jointly and severally bound to pay the Commonwealth of Pennsylvania in the sum of ONE MILLION dollars ($1,000,000). WE are bound by the CONDITIONS of this bond as shown on both sides of this form.
 

 Pursuant to the terms of the bond, both Nam and David agreed that the latter would appear in court at all required times and that Nam, as surety, would notify the
 
 *284
 
 court in writing of any change in David’s address. The Certification also states, “If defendant performs the conditions as set forth herein, then this bond is to be void, otherwise the same shall remain in full force and this bond in the full sum thereof shall be forfeited.” Additionally, both Nam and David authorized the entry of a judgment by confession against them in the amount of the bond, regardless of whether a default of the bond conditions occurred.
 

 On March 12, 1998, David Nam failed to appear in court for a pre-trial status listing in his criminal case. Consequently, on April 6, 1998, the Court of Common Pleas of Philadelphia, Criminal Section, ordered the bail bond forfeited pursuant to the terms of the bond agreement, the Pennsylvania Rules of Criminal Procedure, and local court rules.
 
 [1]
 
 The criminal court entered a judgment against Nam as surety on the forfeited bond in the amount of the bail, plus court costs: $1,000,018.50.
 
 [2]
 
 The notice of entry of judgment against Nam, which bears the caption of David’s criminal case, reads in pertinent part:
 

 Bail in the amount of $1000000.00 has been sued out and judgment entered in the amount of $1000018.50 including cost of $18.50 due to failure of the above named defendant to appear for trial on 3/12/98 in Room 604 CJC 1301 Filbert St.
 

 You may reduce your financial responsibility by producing the defendant forthwith and filing a petition with the Clerk of Quarter Sessions to vacate, in total or in part, the judgment against you.
 

 When David was released on bond, Nam provided him with living quarters and the necessities of life. Some time before his pre-trial status hearing, David fled to South Korea where his paternal grandmother resides. It appears that, once David had fled to Korea, Nam followed him there and paid a lawyer $10,000 to represent David.
 
 See Krasny v. Gi and Yeoung Nam,
 
 245 B.R. 216, 220, 225-26 (Bankr.E.D.Pa.2000). Indeed, Nam testified at a § 341 creditors hearing before the trustee on August 9, 1999, that he had provided David with such assistance.
 
 See id.
 
 at 220.
 
 [3]
 
 David remains a fugitive.
 

 On May 19, 1999, Nam petitioned for bankruptcy under Chapter 7 of the Bankruptcy Code. Nam listed the City of Philadelphia as the creditor on a claim in the amount of $1,045,000, arising from the bail bond security. On August 27, 1999, the City of Philadelphia filed a Complaint in Adversary, alleging that, although Nam had listed the bail bond judgment as an “unsecured non-priority claim” in the
 
 *285
 
 schedule he had filed in the bankruptcy case, such debt was not in fact dischargea-ble pursuant to 11 U.S.C. § 523(a)(7). On September 2, 1999, Nam filed a motion to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6), arguing that the bail bond debt was dischargeable.
 

 II. PROCEDURAL HISTORY
 

 The Bankruptcy Judge granted Nam’s motion to dismiss on December 8, 1999. The Bankruptcy Court rejected the City’s arguments that the judgment against Nam satisfied the elements of § 523(a)(7) and that forfeited bail bonds must be exempted from discharge in order to safeguard the integrity of the bail and criminal justice systems. The court construed § 523(a)(7) narrowly, holding that it only exempts from discharge “obligations imposed upon the debtor as punishment for his wrongdoing” and that the judgment against Nam arose “because a condition of the bond was breached and not because the surety is being punished.”
 

 The District Court affirmed the Bankruptcy Court’s judgment, holding that § 523(a)(7) excepts from discharge only sanctions that are penal, as opposed to civil, in nature and that result from the debtor’s own wrongdoing. The District Court further found that Nam never assumed any independent obligation to produce David in court and, thus, that Nam committed no wrongdoing. Consequently, the court held the debt dischargeable. Moreover, the District Court enunciated a more general proposition concerning the application of § 523(a)(7): A judgment against a surety, arising from a forfeited bail bond, will be exempted from discharge under § 523(a)(7) only if the surety played some affirmative role in the defendant’s failure to appear. This appeal followed.
 

 III. JURISDICTION
 

 The Bankruptcy Court had jurisdiction under Title 11 of the United States Code, 28 U.S.C. § 1334(b), as a complaint to determine the dischargeability of a debt. The District Court had jurisdiction pursuant to 28 U.S.C. § 158(a) and we have jurisdiction of this appeal pursuant to 28 U.S.C. § 158(c) and 28 U.S.C. § 1291. We exercise plenary review over a district court’s bankruptcy decision.
 
 Commonwealth of Pa. Dept of Environmental Resources v. Tri-State Clinical Laboratories, Inc.,
 
 178 F.3d 685, 687 n. 2 (3d Cir.1999).
 

 TV. DISCUSSION
 

 A. SECTION 523(a)(7)
 

 The sole statutory provision at issue in this appeal is the exception to discharge provided by 11 U.S.C. § 523(a)(7), which states in pertinent part:
 

 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
 

 (7) to the extent such debt is for a[l] fine, penalty, or forfeiture [2] payable to and for the benefit of a governmental unit, and [3] is not compensation for actual pecuniary loss, other than a tax penalty....
 

 11 U.S.C. § 523(a)(7) (emendations added). In order to “determine whether [a debt] is dischargeable under § 523(a)(7), we must determine whether [such] debt meets the three requirements of the section.”
 
 In re Rashid,
 
 210 F.3d 201, 206 (3d Cir.2000). Here, the parties do not dispute that Nam’s debt is payable to and for the benefit of a governmental unit (either or both the Commonwealth of Pennsylvania and the City of Philadelphia) or that the $1 million bail bond debt is not compensation for any pecuniary loss by such governmen
 
 *286
 
 tal entities or any other party.
 
 [4]
 
 Consequently, we need only concern ourselves with the construction of the first prong of § 523(a)(7): the “fine, penalty or forfeiture” provision. The City argues that Nam’s debt is a “forfeiture” of the bond amount arising from David’s failure to appear and, therefore, falls within the plain language of the statute. Nam on the other hand contends that the statute only creates an exception for “penal” debts, a category into which Nam’s debt assertedly does not fall.
 

 Following the teaching of the Supreme Court, we have held that the “starting point of any statutory analysis is the language of the statute itself.”
 
 Commonwealth of Pa. Dept. of Environmental Resources v. Tri-State Clinical Laboratories, Inc.,
 
 178 F.3d 685, 688 (3d Cir.1999), citing
 
 Pa. Dept. of Pub. Welfare v. Davenport,
 
 495 U.S. 552, 557-58, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990);
 
 Kelly v. Robinson,
 
 479 U.S. 36, 43, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). Consequently, our analysis of the “fine, penalty or forfeiture” prong of § 523(a)(7) must begin with the plain language of the statute.
 

 On its face, the judgment against Nam seems to come within the plain meaning of the term “forfeiture.” For example, “forfeiture” is defined in
 
 Black’s Law Dictionary
 
 as “a divestiture of specific property without compensation; ... [a] deprivation or destruction of a right in consequence of the nonperformance of some obligation or condition.” Blaok’s Law Diotionaey 650 (6th Ed. 1990). “Forfeiture” is defined by
 
 Webster’s Dictionary
 
 as “the divesting of the ownership of particular property of a person on account of the breach of a legal duty and without any compensation to him: the loss of property or money on account of one’s breach of the terms of an agreement, bond, or other legal obligation.” Webster’s Third New International Dictionary (1971). Clearly, the judgment against Nam arose from David’s nonperformance of his obligation to appear in court and Nam’s breach of his duty to produce David for trial. Moreover, the judgment
 
 [5]
 
 does not compensate the City for any pecuniary loss suffered but instead serves as an incentive to the surety to prevent the defendant’s flight and to produce him insofar as the surety is capable.
 

 The District Court, however, attempted to construe § 523(a)(7) using traditional canons of construction. We find that this attempt at construction results in fact in writing the term “forfeiture” out of the statute.
 

 As a preliminary matter, we note that the District Court’s conclusion that a forfeiture must be “penal” in order to come within the exception conflicts with the plain language of the statute. Nothing in that language equates a forfeiture with a penalty. Quite the contrary, “penalty” and “forfeiture” are two distinct terms within the phrase “fine, penalty, or forfeiture.” Citing
 
 Kelly v. Robinson,
 
 479 U.S. 36, 107 S.Ct. 353; 93 L.Ed.2d 216 (1986) and
 
 In re Collins,
 
 173 F.3d 924 (4th Cir.1999), the District Court reasoned that § 523(a)(7) excepts from dischargeability only those forfeitures which are “penal sanctions that result from the debtor’s wrongdoing.” Finding no such qualification in § 523(a)(7), we disagree with the District
 
 *287
 
 Court’s reasoning. We do not interpret
 
 Kelly
 
 to imply that the “fine, penalty or forfeiture” prong of § 523(a)(7) is restricted in scope to except from dischargeability only obligations of a penal nature. Furthermore, to the extent the Fourth Circuit so interpreted
 
 Kelly
 
 in
 
 In re Collins,
 
 we decline to adopt a similar rule here.
 

 The
 
 Kelly
 
 court addressed the question whether “restitution obligations, imposed as conditions of probation in state criminal proceedings, are dischargeable in proceedings under Chapter 7 of the Bankruptcy Code.”
 
 Kelly,
 
 479 U.S. at 38, 107 S.Ct. 353. The Supreme Court held that such restitution obligations, although not excepted expressly by § 523(a)(7), fall within the § 523(a)(7) exception and, therefore, are not dischargeable.
 
 See id.
 
 at 53, 107 S.Ct. 353. The Supreme Court based this holding on findings that (1) § 523(a)(7) “creates a broad exception for all penal sanctions” and (2) restitution obligations such as the one at issue in
 
 Kelly
 
 constitute “penal sanctions.”
 
 Id.
 
 at 51-53, 107 S.Ct. 353.
 
 Kelly,
 
 therefore, stands for the proposition that § 523(a)(7) excepts from dis-chargeability some penal sanctions that technically are neither fines nor penalties nor forfeitures. However, it does not follow logically from this proposition that § 523(a)(7) excepts
 
 only
 
 sanctions of a penal nature.
 

 The
 
 Kelly
 
 court addressed the penal nature of restitution obligations and the history, object and policy of § 523(a)(7) because the plain language of that statute fails to address “restitution obligations” expressly. The instant appeal is distinguishable from
 
 Kelly
 
 insofar as “forfeitures” — the type of obligation alleged to be at issue — are excepted expressly from discharge by § 523(a)(7). Because § 523(a)(7) expressly excepts forfeitures without regard to penal nature, we need not address this characteristic in assessing the applicability of § 523(a)(7) to Nam’s alleged forfeiture.
 

 Returning to the District Court’s use of the canons of statutory construction, we find its reliance on the canon
 
 ejusdem generis
 
 to lead to an erroneous interpretation of the statute. According to that canon, “where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.”
 
 United States v. Weadon,
 
 145 F.3d 158, 160 (3d Cir.1998). Nevertheless, the District Court’s attempt to render “forfeiture” a more general term than “penalty” is strained and unconvincing. The alternative dictionary definitions of “forfeiture” which the District Court cites span varying degrees of generality. Although
 
 Blade’s Dictionary
 
 characterizes “forfeiture” as a “comprehensive term,” it also defines it as a “divestiture of specific property” — language which resembles that dictionary’s alternative definitions of “penalty” in both its broadness and its specificity; “penalty” is an “elastic term with many different shades of meaning” but is nevertheless “generally confined to pecuniary punishment.” Black’s Law Dictionary 650, 1133 (6th ed. 1990).
 

 It is not necessary to make here the numerous similar observations possible with respect to the dictionary definition of “fine”; it suffices merely to note that the generality of the terms in question cannot be ascertained with any reliability on the basis of their dictionary definitions and that it is difficult to discern any lexical justification for the assertion that “forfeiture” is a more general term than “penalty.” It follows that the canon
 
 ejusdem generis
 
 is inapplicable to this case. Moreover, even were it applicable, it could not be used to reach the result of the District Court — the transformation of the term
 
 *288
 
 “forfeiture” into surplusage — because ejus-dem generis “cannot be employed to render general words meaningless.”
 
 Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.,
 
 169 F.3d 43, 52 (1st Cir.1999),
 
 quoting United States v. Alpers,
 
 338 U.S. 680, 682, 70 S.Ct. 352, 94 L.Ed. 457 (1950).
 

 Similarly flawed is the District Court’s application of the maxim
 
 noscitur a sociis
 
 to subsume the term “forfeiture” within the earlier term “penalty.” The Supreme Court has stated that “[t]he maxim
 
 noscitur a sociis,
 
 that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to Acts of Congress.”
 
 Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV,
 
 209 F.3d 252, 258 (3d Cir.2000),
 
 quoting Jarecki v. G.D. Searle & Co.,
 
 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961). Put differently, the maxim provides that the meaning of an ambiguous statutory term may be derived from the meaning of the accompanying terms.
 
 In re Continental Airlines, Inc.,
 
 932 F.2d 282, 288 (3d Cir.1991). Were the maxim applicable here, it would indeed be possible to hold that the term “forfeiture” should be read as “penal forfeiture” in light of the term’s proximity to the word “penalty.” § 523(a)(7). However,
 
 noscitur a sociis
 
 can have no application in this context because “[w]hen Congress has separated terms with the conjunction ‘or,’ it is presumed that Congress intended to give the terms ‘their separate, normal meanings.’ ”
 
 In re Continental Airlines,
 
 932 F.2d at 288,
 
 quoting Garcia v. United States,
 
 469 U.S. 70, 72, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984). Consequently, we are again referred to the plain meaning of the term “forfeiture” which, as we have indicated
 
 supra,
 
 encompasses debts such as Nam’s.
 

 B. STATE LAW CONTEXT AND HISTORY
 

 As is often the case, such an analysis of the “plain meaning” of the statutory language in a vacuum, while helpful, cannot of itself provide an adequate guide to the proper construction of the statute. To buttress the preceding discussion, we now turn to the state-law context of § 523(a)(7) and its history. As Nam points out in his appellate brief, absent explicit Congressional intent to incorporate state law, the meaning of a term in a federal statute is a question of federal law.
 
 See In re Wilson,
 
 252 B.R. 739, 742-43 (8th Cir. BAP 2000);
 
 accord In re Gianakas,
 
 917 F.2d 759 (3d Cir.1990) (federal law determines dischargeability under 11 U.S.C. § 523(a)(5)). Nevertheless, this fact does not render the characterization of debts such as Nam’s under applicable state law wholly without meaning. Although the label that state law affixes to a certain type of debt cannot of itself be determinative of the debt’s character for purposes of the federal dischargeability provisions, such state-law designations are at least helpful to courts in determining the generic nature of such debts under the law that most directly governs their creation,
 
 e.g.,
 
 whether they are penal or civil, fines or forfeitures.
 

 In the case of Nam’s debt, Pennsylvania law defines a judgment entered against a surety as a result of his failure to produce the defendant in court as a “forfeiture.” Rule 4016(A)(2)(a) of the Pennsylvania Rules of Criminal Procedure, entitled “forfeiture,” authorizes the bail authority to “order the case or other security forfeited” as a sanction for the defendant’s violation of a condition of the bail bond. Local court rules also use the term “forfeiture”; Rule 510A of the Philadelphia Court Rules for the Criminal Division of the Court of Common Pleas authorizes the court to order bail to be “forfeited” when the defen
 
 *289
 
 dant fails to appear for court and states that the surety is obligated to produce the defendant at all required court appearances “under penalty of forfeiture of his bail bond.” Consequently, the District Court correctly conceded that the $1 million judgment against Nam is characterized as a forfeiture under state law.
 

 The history of § 523(a)(7) strongly suggests that Congress intended the sort of forfeiture entered against Nam to come within the exemption from dischargeability set forth in that section. Section 523(a)(7) came into being in 1978, when Congress enacted the present Bankruptcy Code. The parties to this litigation do not dispute that, in enacting the Code, Congress codified case law exempting certain penalties and forfeitures from discharge under the former Bankruptcy Act of 1898. Moreover, such codified case law included a line of authority holding that obligations against sureties arising from forfeited bail bonds were nondischargeable. In what follows, we will review the fundamental historical rationale for and the development of § 523(a)(7) against the background of the prior 1898 Act case law from which that statute emerged.
 

 In general, a discharge granted to a debtor in a Chapter 7 bankruptcy proceeding voids all judgments previously applicable to the debtor, except for debts that are exempt from discharge under 11 U.S.C. § 523, which “expresses Congressional policy that certain debts should be excluded from discharge because of overriding public policy relating to the type of the debt, the manner in which liability for it was incurred, or the underlying social responsibility that it represents.” Bankruptcy Service, Lawyers Edition, Ch. 27: Code 523, § 27:4 at 27-90 (West 1999). Such “[dischargeability exceptions reflect a decision by Congress to allow certain competing public interests to override the ‘fresh start’ purpose of bankruptcy.”
 
 Id.
 
 As the Supreme Court has stated, “Congress evidently concluded that the creditors’ interest in recovering full payment of debts in [the] categories [encompassed by § 523(a)] outweighed the debtors’ interest in a complete fresh start.”
 
 Grogan v. Garner,
 
 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).
 

 Although the 1898 Act contained no provision specifically forbidding the discharge of fines, penalties, or forfeitures due the government, it did provide that certain types of debts were nondischargeable.
 
 See
 
 Bankruptcy Act of 1898, §§ 17, 63 (repealed 1978). Pursuant to § 57j of the 1898 Act, penalties or forfeitures owed to the government were only allowed as a claim in bankruptcy to the limited extent that such penalties or forfeitures compensated the government for a pecuniary loss. Section 57j provided:
 

 Debts owing to the United States, a State, a county, a district, or a municipality as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose.
 

 30 Stat.' 561, 11 U.S.C. § 93 (repealed 1978).
 

 It is evident then that in enacting this provision, Congress intended to protect general creditors against the reduction of debts owed them by limiting the debts allowable to the government to its actual pecuniary losses. A leading treatise on bankruptcy explained the policy considerations underlying § 57j in the following terms:
 

 It is perfectly conceivable that a bankruptcy law is anxious not to curtail this sovereign power to mete out punishment and therefore treats claims for penalties on a footing of equality with, if not of precedence over, other claims. Yet
 
 *290
 
 there is on the other hand the natural tendency and task of the bankruptcy law to mitigate as far as possible the losses to be sustained by creditors, and under this aspect there is an undeniable equity in the postulate that participation in the estate should be denied to a creditor who has neither in some degree contributed to the distributable funds
 
 {e.g.,
 
 by the governmental protection on which taxation is supposed to be based), nor has suffered a pecuniary loss by parting with something in money’s worth. It is this consideration for the bankrupt’s creditors that pervades § 57j.
 

 3 Collier on Bankruptcy, ¶ 57.22[1], at p. 382 (14th ed. 1977).
 

 The notion that the conflicting interests of protecting the government’s power to punish and defending the rights of general creditors should be thus balanced is a recurring theme of the case law under the 1898 Act.
 
 See, e.g., Simonson v. Granquist,
 
 369 U.S. 38, 40, 82 S.Ct. 537, 7 L.Ed.2d 557 (1962) (stating that § 57j “plainly manifests a congressional purpose to bar all claims of any kind against a bankrupt except those based on a ‘pecuniary’ loss. So understood, this section, which has been a part of the Bankruptcy Act since its enactment in 1898, is in keeping with the broad aim of the Act to provide for the conservation of the estates of insolvents.... ”);
 
 Goggin v. United States,
 
 140 F.Supp. 557, 560 (Ct. of Claims 1956) (“[w]hen Congress, in [§ 57j], drew a distinction between a penalty of forfeiture, on the one hand, and the pecuniary loss sustained, on the other, we think it meant that an arbitrarily set amount ... should not be put in competition with the claims of the ordinary creditors of the bankrupt.”),
 
 vacated on other grounds,
 
 138 Ct.Cl. 279, 152 F.Supp. 78 (1957).
 

 Thus, under pre-1978 bankruptcy statutes and judicial decisions, penalties and forfeitures owed to the government were, for the most part, not allowed as claims. The correlative question whether such debts should be dischargeable was firmly settled by the judiciary long before the enactment of the Code in 1978. Because penalties and forfeitures owed to the government were essentially not allowable, courts generally exempted them from discharge as a way of holding debtors responsible for such penalties and forfeitures while avoiding interference with the results of state criminal proceedings.
 
 See United States v. Ron Pair Enters., Inc.,
 
 489 U.S. 235, 245, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989);
 
 Kelly,
 
 479 U.S. at 44-47, 107 S.Ct. 353;
 
 Tri-State Clinical Laboratories,
 
 178 F.3d at 695. As the
 
 Kelly
 
 Court stated, “[djespite the clear statutory language, most courts refused to allow a discharge in bankruptcy to affect the judgment of a state criminal court.”
 
 Kelly,
 
 479 U.S. at 45, 107 S.Ct. 353. This principle of nondischargeability'of penalties and forfeitures payable to the government and not in remuneration of a pecuniary loss was so “uniformly accepted” by 1978 that Congress incorporated it into the Code as an explicit statutory exception to discharge-ability in § 523(a)(7).
 
 Ron Pair,
 
 489 U.S. at 245 n. 8, 109 S.Ct. 1026;
 
 Kelly,
 
 479 U.S. at 44-46, 107 S.Ct. 353, quoting 1A Collier on Bankruptcy ¶ 17.13, at 1609-10
 
 &
 
 n. 10 (14th ed. 1978);
 
 id.
 
 at 51, 107 S.Ct. 353 (recognizing that § 523(a)(7) “codified the judicially created exception to discharge for fines[, penalties and forfeitures]”).
 

 C. CASE LAW
 

 The line of authority underlying this judicially-created exception is an old and venerable one, stretching back to the turn of the twentieth century. In
 
 In re Caponigri,
 
 193 F. 291, 292 (S.D.N.Y.1912), Judge Learned Hand addressed the issue whether a claim of the United States on a
 
 *291
 
 forfeited recognizance for bail in a criminal case, asserted against a debtor who had acted as surety for a defendant who fled, was allowable, given that it constituted a penalty or forfeiture under former § 57j. Significantly, in
 
 Caponigri,
 
 as in the instant case, the debtor was a surety for the criminal defendant and not the defendant himself. Judge Hand held that “the recovery on a recognizance for bail is essentially the recovery of a penalty, and is a forfeiture.” 193 F. at 292. Judge Hand adhered to the concept of a penalty being by definition unrelated to any pecuniary loss; the amount of a penal obligation, he wrote, “is measured neither by the obligee’s loss nor by the valuation placed by him upon what he has given in exchange.”
 
 Id.
 

 In the years that followed,
 
 Caponigri
 
 came to be viewed as controlling authority on the question of the allowability of forfeited bail bonds.
 
 See, e.g., In re Lake,
 
 22 Am. Bankr.N.S. 168 (F.Ref. Minn.1932). More significantly, however, the
 
 Caponigri
 
 decision provided an analytical framework for defining debts. This framework was applied to determine the allowability of types of penalties and forfeitures other than bail bonds. . Many cases applied Judge Hand’s penalty test to find obligations to be disallowed where the obligations were imposed for coercive or regulatory purposes and were not proportionate to any actual pecuniary loss.
 
 See, e.g., In re James Butler Grocery Co.,
 
 22 F.Supp. 993, 994-95 (E.D.N.Y.1938);
 
 In re Erlin Manor Nursing Home, Inc.,
 
 36 B.R. 672, 678-79 (Bankr.D.Mass.1984);
 
 In re Idak Corp.,
 
 19 B.R. 765, 772-75 (Bankr.D.Mass.1982).
 

 Moreover, the reasoning of
 
 Caponigri
 
 was applied to dischargeability as well as to allowability. As early as 1914, a court in New York held that claims by governments against sureties for judgments on forfeited bail bonds were nondischargeable under the 1898 Act.
 
 See In re Weber,
 
 212 NY. 290, 106 N.E. 58 (1914).
 
 See also Commonwealth v. McMillen,
 
 10 Ky.Op. 699, 1 Ky.L.Rptr. 270 (1880) (accord). In
 
 Weber,
 
 the debtor sought the discharge of a judgment entered against him on a forfeited bail bond. Following Judge Hand’s decision in
 
 Caponigri,
 
 the court found the obligation not to be allowable.
 
 See Weber,
 
 212 N.Y. at 291-92, 106 N.E. at 59. The court went further, however, ruling that because the obligation was not allowable, it was also not dischargeable: “It could not have been intended by the Bankruptcy Act that a bankrupt should be discharged of the payment of a debt which was not allowable.”
 
 Id.
 

 Both factually
 
 [6]
 
 and legally,
 
 Weber
 
 is on all fours with the instant case. Moreover, the parties to this appeal agree, and the Supreme Court instructed in
 
 Kelly,
 
 that cases under the 1898 Act, relating to the dischargeability of certain fines, forfeitures and penalties, comprise part of the judicially-created body of exceptions that Con
 
 *292
 
 gress codified in § 523(a)(7), and therefore guide courts’ dispositions of such cases. As the District Court stated, “courts interpreting the present Bankruptcy Code have referred to the practices under the Act of 1898 that preceded it, and in construing provisions of the Code that were codifications of earlier judge-made law, as § 523(a)(7) evidently was, courts interpret the codification to match the prior judge-made law absent evidence of specific intent that it be interpreted otherwise,
 
 see Kelly,
 
 479 U.S. at 44, 47, 107 S.Ct. 353.” District Court Opinion at 18 n. 19. Nevertheless, the District Court failed to follow this teaching insofar as it entirely ignored
 
 Weber,
 
 notwithstanding the City’s heavy reliance on that case in its reply brief.
 

 The District Court sought to explain its refusal to rely upon pre-Code jurisprudence with the assertion that practice relating to the dischargeability question at issue was “mixed” during that period. This view is based upon a single case,
 
 United States v. Hawkins,
 
 20 F.2d 539 (S.D.Cal. 1927).
 
 Hawkins,
 
 however, conflicts with all other judicial and scholarly authority which recognizes the exception to dis-chargeability for penalties and forfeitures — an exception which the District Court itself acknowledged as axiomatic in its opinion.
 
 [7]
 
 Given that
 
 Hawkins
 
 is a summary opinion of only two paragraphs, bereft of analysis and lacking any references to
 
 Caponigri, Weber, McMillen,
 
 or the judicially-created exception to dis-chargeability for penalties and forfeitures, it is virtually worthless as a precedent.
 
 [8]
 
 Even if we could properly rely on
 
 Hawkins,
 
 the decision by its terms stands only for a very narrow proposition not directly applicable here: § 17 of the 1898 Act provides no exception whatever to discharge-ability for penalties and forfeitures. We conclude that the District Court erred in relying on
 
 Hawkins
 
 for the proposition that pre Code practice concerning the dis-chargeability of penalties and forfeitures was “mixed.”
 

 D. PUBLIC POLICY CONSIDERATIONS
 

 The clarity and weight of the judicial authority discussed
 
 supra
 
 are great enough that such authority provides a sufficient basis for deciding this appeal. Nevertheless, the implications of this case for the administration of justice are potentially of such a magnitude that it is necessary to devote more than passing attention to the public policy considerations underlying the dischargeability question. These issues range from socioeconomic equity to the ability of the several States to administer their justice systems.
 

 First and foremost among these policy concerns is the issue of socioeconomic fairness. Let us return to some critical facts presented by this case — facts emphasized by neither party to this litigation. Here, Nam, the father of the fugitive defendant, had sufficient means to pay $100,000 in cash and to assure payment of the remain
 
 *293
 
 ing $900,000 in the event of forfeiture. As the Pennsylvania District Attorneys Association points out in its amicus brief, the parents and relatives of the typical accused felon in Philadelphia, who is more likely than not economically disadvantaged, do not have such resources at their command. The average defendant is forced to remain in jail while awaiting trial, all but certainly experiencing far poorer living conditions than the defendant free on bail. At least one bankruptcy court has discussed this danger:
 

 Eventually, freedom on bail would be restricted to those defendants who could pay cash up front,
 
 ie.,
 
 wealthy defendants only. Poor and middle class defendants would be forced to languish in overcrowded jails. [Among t]he end results would be ... inequitable discrimination against those defendants not fortunate enough to possess thousands of dollars in ready cash.
 

 In re: Bean,
 
 66 B.R. 454, 457 (Bankr.D.Colo.1986). The District Court’s decision, therefore, opens the door to accusations that the Philadelphia justice system treats the wealthy and the poor differently.
 

 Also of concern are the implications of the District Court’s decision for principles of federalism and comity that must be respected in order to insure the proper functioning of the several States’ justice systems. In
 
 Kelly,
 
 the Supreme Court stated that “we must consider the language of § 523 in light of the history of bankruptcy court deference to criminal judgments and in light of the interests of the States in unfettered administration of their criminal justice systems.”
 
 Kelly,
 
 479 U.S. at 43-44, 107 S.Ct. 353. Throughout its opinion, the Supreme Court repeatedly emphasized the significant deference due to state criminal proceedings in the context of federal bankruptcy law. Discussing § 523, the Court wrote, “[o]ur interpretation of the [Bankruptcy] code also must reflect the basis for this judicial exception, a deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings.”
 
 Id.
 
 at 49, 107 S.Ct. 353 (citation omitted). The District Court’s opinion fails to take account of these important considerations, and, insofar as its decision in favor of Nam sanctions the use of federal bankruptcy laws to evade the financial consequences of noncompliance with Pennsylvania’s bail system, it constitutes the very sort of federal interference with a State’s administration of justice which the Supreme Court condemned in
 
 Kelly.
 

 The course that the District Court urges entails not only relatively abstract problems such as these, but also potentially grave concrete consequences for the States’ administration of their respective criminal justice systems and the proper functioning of the bail system. In terms of a basic behavioral incentive analysis, the rule that the District Court proposes would throw into doubt the viability of the current bail system by creating perverse incentives for sureties who are also relatives of the defendant, as well as for such defendants themselves. Once a criminal defendant becomes convinced that his relative will be able to escape financial responsibility (other than the negative, albeit temporary and comparatively lesser, consequences of the bankruptcy filing itself) for the bail amount if the defendant flees, the incentive to appear for trial diminishes sharply. Similarly, given that the surety would no longer face a sizable debt should the defendant flee (again, leaving aside the consequences of a bankruptcy), the surety would no longer be deterred from assisting the defendant in his flight. This is a particularly serious risk in cases, such as the Nams’, in which the criminal defendant
 
 *294
 
 faces execution. Many a father might consider the opportunity to purchase his son’s life at the cost of enduring a bankruptcy proceeding to be an attractive bargain.
 
 [9]
 

 The States’ bail systems are “central to our modern criminal procedure”; any threat to their efficacy and integrity damages the States’ criminal justice systems.
 
 In
 
 re:
 
 Bean,
 
 66 B.R. at 456-57; see
 
 Commonwealth v. Truesdale,
 
 449 Pa. 325, 335-36, 296 A.2d 829, 834-35 (1972) (discussing purpose and importance of bail system);
 
 Ruckinger v. Weicht,
 
 356 Pa.Super. 455, 457, 514 A.2d 948, 949 (1986) (same). Were we to permit the rule that the District Court proposes, the effectiveness of the bail system would be reduced because the risk of flight by criminal defendants released on bail under bonds executed by nonprofessional sureties would increase. The adverse consequences of the proposed rule are obvious. They include hampering the States’ ability to prosecute criminal defendants, thereby increasing the danger such persons pose to the public; imposing increased costs on the States for locating and capturing fugitives; increasing the costs of pre-trial detention for defendants who otherwise would be released on bail; and exacerbating the already serious problem of overcrowding in detention facilities. Such costs, however “difficult to quantify,” are, contrary to the District Court’s view, hardly “marginal” considerations.
 

 V. CONCLUSION
 

 For the foregoing reasons, we will reverse the decision of the District Court and remand this case for further proceedings consistent with this opinion. We hold that, in light of the statute’s plain language, its history, and applicable case law, 11 U.S.C. § 523(a)(7) does except from discharge in a Chapter 7 bankruptcy a bail bond forfeiture judgment entered against a family surety for failure to produce the defendant for trial.
 

 [1]
 

 .
 
 See
 
 Pa.R.Crim.P. 4016(A)(2)(a); Rule 510A of the Philadelphia Court Rules for the Criminal Division of the Court of Common Pleas.
 

 [2]
 

 . Given that Nam had initially posted $100,000, or 10% of the total bail, in cash, it is not clear why the court did not enter a judgment in the amount of $900,018.50. That question, however, is not before this Court and we do not address it.
 

 [3]
 

 . Because these facts concerning Nam’s possible collusion with his son are not part of the record in the instant case, we do not rely upon them in deciding this appeal. Indeed, it follows as a matter of law from our holding here that we need not reach the question whether Nam has aided his son and thereby engaged in "wrongdoing” sufficient to forfeit his right to seek dischargeability under the District Court’s rule. Nevertheless, we include this information here to illustrate the difficulty of administering a rule such as the one formulated by the District Court that would make the wrongdoing of the debtor dispositive of the question of dischargeability.
 
 See
 
 Sections II and IV.A,
 
 infra.
 
 Indeed, given Nam’s colorable misconduct, it would seem that the District Court misapplied the rule in the very case in which it announced it.
 

 [4]
 

 . As the District Court correctly noted, the $18.50 in costs might be regarded as compensation for a pecuniary loss on the part of the court system. In what follows, we assume that is so, and confine our discussion to the remaining $1 million (arguably as reduced by the $100,000 that Nam has already paid).
 
 See
 
 District Court opinion at note 10; note 2,
 
 supra.
 

 [5]
 

 . Excluding the $18.50 in court fees.
 
 See
 
 notes 2 and 4,
 
 supra.
 

 [6]
 

 . The opinion does not make clear whether the debtor was the criminal defendant or a surety for another. Nevertheless, the
 
 Weber
 
 Court's wholesale adoption of Judge Hand's analysis in
 
 Caponigri
 
 suggests that the cases were factually identical. Additionally, at least one bankruptcy treatise suggests that the debtor in
 
 Weber
 
 was in fact a surety.
 
 See
 
 Harold Remington,
 
 A Treatise on the Bankruptcy Law of the United States,
 
 vol. 8, § 3304 at 156 (6th ed. 1956) (citing
 
 Weber
 
 as authority for the proposition that "Q]udgment against the
 
 bondsman
 
 on an appearance bond in a criminal case, forfeiting the bond, is ... not dischargeable”) (emphasis added). Regardless of identity of the debtor in
 
 Weber,
 
 however, that decision still governs the instant case because of the broad scope of its underlying rationale: "It could not have been intended by the Bankruptcy Act that a bankrupt should be discharged of the payment of a debt which was not allowable.”
 
 Weber,
 
 212 N.Y. at 291-92, 106 N.E. at 59.
 

 [7]
 

 .
 
 See In re: Gi Nam,
 
 254 B.R. 834, 846 n. 25 (E.D.Pa.2000) (noting "pre-Code judicial practices by which courts found that judgments of state criminal courts were not discharged in bankruptcy despite that the strict application of the letter of the Act of 1898 would have discharged them” (citing
 
 Kelly,
 
 479 U.S. at 44-48, 107 S.Ct. 353)).
 

 [8]
 

 . The Bankruptcy Court here recognized the limited usefulness of
 
 Hawkins,
 
 noting that the "court’s decision in
 
 United States v. Hawkins ...
 
 consists of only two paragraphs. The court simply held that none of the four exceptions to discharge listed in § 17 of the Act covered the debt of a surety on a bail bond. It did not analyze whether the words 'fine, penalty or forfeiture' cover a surety's obligation on a bail bond.”
 
 In re: Gi Nam,
 
 255 B.R. at 155 n. 7.
 

 [9]
 

 . Of course, these concerns do not come into play when a professional bail bondsman acts as surety for a criminal defendant. In such cases, the professional bondsman is not inherently interested in helping the defendant avoid punishment; nor is the defendant likely troubled by the impact of his actions on the bondsman's finances. Professional bondsmen are compensated in advance through fees for the risk that the defendant will flee; consequently, the forfeiture of a bail bond is, from the perspective of the bondsman, merely an anticipated cost of doing business.
 
 See In re Collins,
 
 173 F.3d 924, 932 (4th Cir.1999). Nevertheless, the instant case does not present, and we therefore do not address ourselves to, the question of professional sureties. For that reason, we find both
 
 Collins
 
 and the recent Fifth Circuit decision in
 
 In re Hickman,
 
 260 F.3d 400 (5th Cir.2001) inapplicable to the case at bar in part because those cases involved commercial bail bondsmen. It should be noted that many jurisdictions, including Philadelphia, do not provide for professional bondsmen.